ELECTRO–CRAFT CORPORATION,
Respondent,

v.

CONTROLLED MOTION, INC., et
al., Appellants.

Nos. C7–81–894, C0–81–1188.

Supreme Court of Minnesota.

April 15, 1983.

Rehearing Denied July 6, 1983.

Maun, Green, Hayes, Simon, Johnanneson & Brehl, Richard D. Donohoo and Garrett E. Mulrooney, St. Paul, for appellants.

Leonard, Street & Deinard, Harold D. Field, Jr., and Michael A. Nekich, Minneapolis, for respondent.

COYNE, Justice.

Respondent Electro-Craft Corporation ("ECC") sued appellants Controlled Motion, Inc. ("CMI") and CMI's president, John Mahoney, (a former employee of ECC) for misappropriation of trade secrets. ECC claimed that CMI and Mahoney improperly copied the designs of ECC's electric motors. The district court found that misappropriation had occurred and also found appellants in contempt for violating a temporary restraining order. We reverse the order for judgment based on misappropriation and affirm the order finding appellants in contempt.

THE PRODUCTS

ECC, a Minnesota corporation, manufactures D.C. iron core motors, moving coil motors, brushless motors, and other products. ECC has four plants, three of which manufacture motors and motor parts. The total employment of those three plants is around 500.

CMI is a Minnesota corporation which manufactures moving coil motors. John Mahoney is the president and founder of CMI. Mahoney was formerly national sales manager for ECC. While at ECC, Mahoney established ECC's customer relationships with Storage Technology Company and IBM, customers for the motors involved in this lawsuit.

ECC and CMI manufacture high performance D.C. motors, called "servo" motors, which are able to start and stop at least 30 times per second. These motors are useful for such high technology applications as computer disc drives and printers and industrial robots. In this action ECC claims misappropriation of trade secrets with respect to one moving coil motor and one brushless motor.

Moving coil motors, also known in some forms as shell-type armature motors or basket armature motors, represent a major development in high performance motors. In traditional D.C. motors, the rotor (moving component) consists of an iron core with wire wrapped around it in coils; the stator (stationary component) consists of permanent magnets, which create a magnetic field through the coils, causing motion when current is passed through the coils. In a *moving coil* D.C. motor, the coils of wire are not wrapped around a core to form the armature or rotor; the coils themselves form the armature. The wire coils are formed into a cylindrical basket which is made rigid by a combination of adhesives and other materials such as fiberglass. Since the moving part of the motor is a hollow shell, the inertia of the motor is reduced while the torque remains high. The motor may thus start and stop quickly without fighting as much inertia as is present in the iron core motors.

Working moving coil motors have been produced for many years. However, the early motors were low performance motors because of problems in making the coil structure rigid. These problems have been solved today because of developments in adhesives.

Iron core motors and moving coil motors, described above, use brushes and commutators to transmit current to the proper coils in the rotating armature. As the armature

turns, different segments of the commutator (connected to different coils) come into contact with the stationary brush; thus, different coils receive current. These brush-type motors have two major disadvantages. First, these motors involve sliding contact between the brushes and the commutator; therefore, parts tend to wear out quickly, and some arcing occurs in the commutators, causing interference. Second, heat buildup is a problem in moving coil motors. The wires, which heat up as current is passed through them, are on the inside and surrounded by magnets, which trap the heat. Thus, moving coil motors must have a complex cooling system to draw away the heat.

*Brushless* motors solve these two problems by having the wire coils stationary on the outside, with the magnets mounted on the rotor. Thus, the heat can easily be drawn away from the coils on the outside. Furthermore, the coils do not move, so brushes are not required to transmit current, and no sliding contact exists to cause breakdowns. The brushless motor contains a sensing device to activate the proper coils to cause rotation. Brushless motors were developed more than 20 years ago for military and aerospace projects, but these were very expensive. Until six or seven years ago, the only commercial brushless motors were low performance models.

According to Mr. Edward Kelen, president of ECC, ECC was one of only three significant producers of small moving coil motors in 1980. Also, although seven companies produced brushless servo motors, ECC had more than half of the private sector domestic market. Motors made for the producer's own use and motors produced for military or foreign markets were not included in Kelen's evaluations, but it seems clear that ECC's share of the overall servo motor market is substantial. Moreover, Kelen testified that the total brushless motor market is growing rapidly; in five years (from 1980) it was projected to grow from two million dollars to fifty or sixty million dollars per year.

ECC began work on moving coil motors in 1966. At this time Honeywell had already applied for a patent on a moving coil motor. ECC began making primitive moving coil motors in 1967; ECC developed its 1030/1040 motor to meet the needs of users of a comparable Honeywell motor, the 33 V.M. The two motors are nearly identical, and Designer Erland Persson had a 33 Honeywell V.M. in his possession when he designed ECC's 1030/1040. Persson testified that he had problems with the adhesives and supporting materials for the 1030/1040 and that it took ECC from six to eight months to develop the armature for the motor.

About 1974, Robert Schept, Engineering Manager at ECC, designed the successful ECC 1600 moving coil motor. Schept studied various other motors on the market to try to determine the best combination of dimensions for the motor. Subsequently, Schept designed the 1125 moving coil motor for ECC. He did this by scaling down the ECC 1600 while keeping its performance basically the same. Schept testified that it took four to five months to design prototypes for the 1125 and around a year to start actual production. The 1125 is now used for a variety of applications; for each application ECC produces a different model 1125 with different dimensions. The model involved in this case is the 1125–03–003, designed for a specific computer system built by Storage Technology Co.

ECC's brushless motors are of more recent origin than that of ECC's moving coil motors. Nonetheless, a long process of trial and error, using new developments in technology and costing approximately two million dollars, has been involved in the development of workable models. ECC initially sent prototypes to several customers. Finally ECC worked with IBM to develop a prototype motor for an IBM printer. This model was a very successful enterprise for ECC, since ECC became the only known source of motors for the IBM project. For around five years, ECC has also been working with Ford Motor Company on a new application for ECC brushless motors. This application involves using larger ECC mo-

tors in automated assembly lines. ECC has produced several prototypes for Ford and hopes to begin production in 1983.

THE EVENTS

In May of 1980, John Mahoney, while employed by ECC, began to explore the possibility of starting his own business. Mahoney already had many contacts in the business, including people at Storage Technology and at IBM—ECC customers for the ECC 1125–03–003 and brushless motors. Mahoney had also guided development of the IBM project and the Ford project. On June 12, 1980, Mahoney hired an attorney as counsel for the proposed new business, and counsel helped Mahoney prepare a prospectus which was circulated to prospective investors. Mahoney met with several prospective investors during June and July but apparently received no investments before August 1980.

The prospectus indicates that Mahoney proposed to compete with ECC in its IBM and Ford applications. Mahoney planned to complete prototypes for IBM in twelve weeks and obtain IBM approval in another week. Mahoney planned to try eventually to enter the market for the Ford systems. The prospectus projected revenues in the third month from sales of the prototype brushless motors but projected no research and development expenses for the first few months.

In June of 1980 Mahoney met with several of his fellow ECC employees about their joining the new business. On August 6, 1980, Mahoney resigned from ECC. Mahoney and ECC's president, Kelen, met briefly regarding trade secrets and Mahoney told Kelen not to worry. On September 16, 1980, four other ECC employees resigned in order to work for Mahoney's company, now called CMI. The four employees were:

(1) William Craighill, a mechanical engineer who worked with ECC on the design of the ECC 1125 and the brushless motor for IBM. Craighill had previously worked for Control Data Corporation. At Control Data, Craighill did not design D.C. electric motors but worked on systems which he testified were similar to D.C. electric motors.

(2) James West, previously Quality Assurance Manager at ECC for electric motors. West was acting plant manager at one ECC plant for six months.

(3) William Anderson, who had worked for ECC as a technician for about two years. Anderson now works for Honeywell.

(4) Lynn Klatt, Buyer's Assistant at ECC, who was familiar with ECC's vendors and with the parts used in ECC's motors.

All of these employees, as well as Mahoney, had signed confidentiality agreements [1] when hired by ECC. None of these agreements, however, included a non-competition clause. When these four employees left ECC, ECC's management conducted exit interviews. The employees were asked to sign acknowledgment forms which outlined the areas that ECC considered confidential; only Anderson signed the acknowledgment.

On September 17, 1980, Mahoney met with some IBM representatives about developing a CMI motor as an alternative to the ECC brushless motor. The IBM representatives said that IBM would not deal with such a new company and that Mahoney should try again in 6 months.

On September 18, Mahoney traveled to Colorado to meet representatives of Storage Technology Co. Mahoney received the specifications for a moving coil motor to

---

1. The agreements were part of the employment agreements, reading in part as follows:

FOURTH—Employee shall not directly or indirectly disclose or use at any time, either during or subsequent to the said employment, any secret or confidential information, knowledge, or data of Employer (whether or not obtained, acquired or developed by Employee) unless he shall first secure the written consent of Employer. Upon termination of his employment Employee shall turn over to Employer all notes, memoranda, notebooks, drawings or other documents made, compiled by or delivered to him concerning any product, apparatus or process manufactured, used or developed or investigated by Employer during the period of his employment; it being agreed that the same and all information contained therein are at all times the property of the Employer.

meet Storage Technology's application, at that time supplied by the ECC 1125–03–003 and a Honeywell motor. Mahoney delivered prototypes of a CMI motor, the CMI 440, to Storage Technology on December 15, 1980; the motor was finally approved on March 1, 1981.

The evidence is conflicting as to how CMI produced the 440. The CMI 440 is almost identical in dimensions and tolerances[2] to the ECC 1125–03–003. William Craighill, the former ECC employee who developed the CMI 440, testified that he did not copy, nor even possess, an ECC 1125 motor when he designed the CMI 440. Craighill claimed that he used only a similar Honeywell motor, the Storage Technology specifications, and his own calculations to develop the CMI 440. On the other hand, circumstantial evidence pointed to the conclusion that CMI employees copied the ECC 1125. The similarity of the motors suggests copying, although the motors are not absolutely identical. Furthermore, the manufacturing processes, adhesives, and other materials are nearly identical. Expert testimony differed as to how long it should have taken CMI to "reverse engineer" the motor by taking apart an ECC 1125, measuring the parts and testing the material, and putting the plans together. A CMI expert estimated that it should have taken two to three months to develop a prototype motor. An expert for ECC estimated that the process would take at least six months to a year. Kelen estimated it would take a year.

CMI has, by reverse engineering, also been able to market remanufactured ECC and Honeywell motors. In remanufacturing, CMI replaces the parts to a broken motor, rebuilds it and rewarrants it.

THE ACTION

On September 26, 1980, about six weeks after Mahoney's resignation, ECC sued CMI and Mahoney (hereinafter referred to together as "CMI") claiming that CMI misappropriated ECC's trade secrets. On October 1, 1980, Judge William Posten issued an order which enjoined CMI from accepting orders from ECC's principal "Customer" (not named in the complaint but later shown to be IBM) with respect to "brushless" motors. After a preliminary hearing Judge Lindsay Arthur of the Hennepin County District Court granted a temporary injunction in favor of ECC on April 16, 1981. CMI was enjoined by this order, pending decision at trial, from "directly or indirectly selling or soliciting sales of any low inertia, DC, electric servo motor for which any component not available on the open market has dimensions closer than 10% to Plaintiff's 1125 motor." It was later established that CMI had continued to produce and sell electric motors after April 16, 1981. On July 9, 1981, Judge Arthur issued an order holding CMI in civil contempt for violating the temporary injunction. CMI was ordered to pay ECC $50.00 damages for each offending motor which CMI had sold since April 16, 1981, plus the premiums on ECC's cost bond. The $50.00 per motor damages were later rescinded for lack of evidentiary foundation, but CMI remained liable for the bond premiums.

A trial was held before Judge Arthur, without a jury, from June 15, 1981 to July 7, 1981. By order of October 19, 1981, Judge Arthur found that CMI had misappropriated ECC's trade secrets and enjoined CMI from producing or selling any "brushless or low inertia electric motor or tachometer" with dimensions within 10% of the dimensions of ECC's 1125 motor or ECC's brushless motor produced for IBM. The injunction was to be in effect for 12 months after the expiration of the last stay of execution of the order. The court also awarded ECC $50.00 in exemplary damages (but no compensatory damages) for each offending motor sold.

CMI appealed separately from (1) the temporary injunction order of April 16 and the contempt order of July 9 (No. C7–81–894) and (2) the final order of October 19 (No. C0–81–1188). ECC filed a notice of

---

**2.** Tolerances are the allowable manufacturing errors in dimension which still allow a working product. For example, a part may be required to be five one-thousandths of an inch in diameter, plus or minus one ten-thousandth of an inch.

review of the district court's final order, seeking compensatory damages, attorney fees, and further injunctive relief, and seeking recovery against John Mahoney individually. The appeals have been consolidated for consideration.

THE ISSUES

Review of the district court's order is made difficult by the complexity of the issues and the sheer volume of technical evidence. We must affirm the final order if we can ascertain that (1) ECC has protectable trade secrets—i.e., that the district court correctly enumerated the necessary elements of trade secret status and found those elements to exist, and that those findings are reasonably supported by the evidence; (2) that ECC's trade secrets, if they exist, have been misappropriated by CMI; and (3) that the relief granted in the final order was appropriate. In reviewing the contempt order we must determine whether the district court properly held CMI in contempt and whether the relief granted to ECC was appropriate.

A. *Trade Secret Status.*

■ The Uniform Trade Secrets Act, Minn.Stat. §§ 325C.01–325C.08 (1982)[3] allows the protection of certain types of information through an action for misappropriation. Misappropriation is defined as improper acquisition, disclosure, or use of a "trade secret." Minn.Stat. § 325C.01, subd. 3. Without a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful.[4]

■ 1. In defining the existence of a trade secret as the threshold issue, we first focus upon the "property rights" in the trade secret rather than on the existence of a confidential relationship. 12 Business Organizations, Milgrim, *Trade Secrets* § 1.09 at 1–42 (1981). We recognize that the confidential relationship is also a prerequisite to an action for misappropriation, *Jostens, Inc. v. National Computer Systems, Inc.,* 318 N.W.2d 691, 701 (Minn.1982), and that the elements of trade secret status and the confidentiality of the relationship "should not be artificially separated for purposes of analysis since, in a significant sense, they are interdependent." *Id.* at 701, quoting 1 Milgrim, *Trade Secrets* § 7.07(1) at 95. However, without the finding of a trade secret, we cannot grant relief to ECC. Otherwise this court would come dangerously close to expanding the trade secrets act into a catchall for industrial torts.[5]

■ 2. In order to determine the existence of trade secrets, we must first determine what trade secrets are claimed by ECC and what trade secrets were found by the district court. CMI claims that neither ECC nor the district court were specific enough in defining ECC's trade secrets.

---

3. The Act became effective in Minnesota on August 1, 1980. Only Minnesota and Louisiana have adopted the Uniform Act.

4. *Jostens, Inc. v. National Computer Systems,* 318 N.W.2d 691, 701 (Minn.1982). *Accord, Henry Hope X-Ray Products, Inc. v. Marron Carrel, Inc.,* 674 F.2d 1336, 1341 (9th Cir.1982) (reluctantly following Pennsylvania Law); *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 358–59, 224 N.W.2d 80, 92 (1974); *Van Products Co. v. General Welding & Fabrication Co.,* 419 Pa. 248, 268–69, 213 A.2d 769, 780 (1965). *Contra, Goldberg v. Medtronic, Inc.,* 686 F.2d 1219, 1228 (7th Cir.1982) (purporting to apply Minnesota law); *Servo Corp. of America v. General Electric Co.,* 393 F.2d 551, 555 (4th Cir.1968); *Smith v. Dravo Corp.,* 203 F.2d 369, 374–75 (7th Cir.1953); *U.S.M. Corp. v. Marson Fastener Corp.,* 379 Mass. 90, 103–104, 393 N.E.2d 895, 903 (1979) (dictum). For an excellent discussion of cases dealing with this issue, see Sloan, *Trade Secrets: Real Toads in a Conceptual Garden,* 1 W.St.U.L.Rev. 113, 131–140 (1973).

5. Therefore, we disagree with the holding in *Goldberg v. Medtronic, Inc.,* 686 F.2d 1219 (7th Cir.1982). In *Goldberg* the court held that, even after the supposedly secret information had been made public through foreign patents, a defendant could be liable for misappropriation if defendant breached a confidential relationship. *Id.* at 1228. The court in *Goldberg,* supposedly applying Minnesota law, cited *Cherne Industrial, Inc. v. Grounds & Associates,* 278 N.W.2d 81 (Minn.1979), for its holding that only breach of a confidential relationship is required. However, *Cherne* does not support that holding, and the court in *Goldberg* did not mention the *Jostens* opinion (which was released almost four months earlier than *Goldberg*), which supports our contrary view today.

CMI also claims that ECC's definition of its trade secrets changed during the course of the litigation. Therefore, according to CMI the district court should be reversed due to lack of specificity.

Regarding the brushless motor, we agree with CMI that ECC did not specify its trade secrets at trial. Nor did ECC even introduce the dimensions, tolerances, etc. of the brushless motor into evidence. The trial court found trade secrets in the general "design procedures" for the brushless motor. The court then enjoined CMI with respect to duplication of only the *dimensions* of the brushless motors. This lack of clarity is fatal to ECC's claim. On the record before us, ECC did not meet its burden of showing that certain features of the brushless motor were protectable trade secrets which might be misappropriated in the future. Furthermore, given ECC's lack of specificity, it was impossible for the district court to fashion a meaningful injunction which would not overly restrict legitimate competition for the IBM project.

■ With respect to the moving coil motors, however, ECC claims that the dimensions, tolerances, adhesives,[6] and manufacturing processes of the ECC 1125–03–003 motor are trade secrets.[7] The thrust of ECC's claim is that the specific combination of details and processes for the 1125 motor is a trade secret, and the evidence of the specific features of the 1125 motor sold to Storage Technology adequately identifies the information which ECC claims constitutes a trade secret.[8] We believe that ECC's claim was specific enough in identifying its trade secrets to support a misappropriation action with respect to the 1125.

■ 3. In determining whether ECC has proven the existence of a trade secret in the 1125 motor, we look to the common law and the Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01–325C.08 (1982). The Act, which became effective on August 1, 1980, carries forward, explains, and clarifies many of the rules of the common law of trade secrets.[9] To the extent, however, that the Act modifies the common law, we are constrained to give effect to the statutory language.

■ The common law of trade secrets in Minnesota has been defined by two recent pre-Act cases. In *Cherne Industrial, Inc. v. Grounds & Associates, Inc.,* 278 N.W.2d 81 (Minn.1979), we adopted the four-point test of Restatement, Torts § 757: to be a trade secret the information must (1) not be generally known or readily ascertainable, (2) provide a competitive advantage, (3) have been developed at plaintiff's expense, and (4) be the subject of plaintiff's intent to keep it confidential. 278 N.W.2d at 90. In *Jostens, Inc. v. National Computer Systems,* 318 N.W.2d 691 (Minn.1982), we applied the above test to a case quite similar to the one at bar. In *Jostens* plaintiff used a computer system for designing student class rings. Defendant company hired a former employee of plaintiff to design similar computer systems. The programs were written for defendant by the company which had written plaintiff's programs. This court used the first and fourth *Cherne* factors to uphold the trial court's finding that plaintiff

---

**6.** ECC's exhibits did not specify which particular adhesives are used in the 1125. However, the evidence does show that ECC discovered an aging process for one adhesive (allowing the adhesive to stand for several days before use). CMI uses the same process in manufacturing the CMI 440.

**7.** The trial court rejected ECC's claim that the vendors of materials and components of the moving coil motor constituted a trade secret.

**8.** CMI's comparison of this case to *Jostens,* note 4 *supra,* is not persuasive. In *Jostens* this court affirmed a trial court ruling that plaintiff had not proven its trade secrets claim, noting

that plaintiff's "claim of a trade secret is rather elastic. At times the claim appears to include the entire CAD/CAM system; at other times, something less." 318 N.W.2d at 697. However, in *Jostens* we examined each possible definition of trade secret that could have been advanced by plaintiff and found them all to be without merit, affirming the trial court. Therefore, *Jostens* does not require reversal in this case if the elements of a trade secret are satisfied.

**9.** *See* Uniform Trade Secrets Act, Commissioner's Prefatory Note 14 U.L.A. 537, 538 (1979).

had no protectable trade secrets: the system was readily ascertainable because it was not novel, and plaintiff did not show an intent to keep the system secret. 318 N.W.2d at 698–701.

The test used in *Cherne* and *Jostens* is now more or less embodied in the Act, Minn.Stat. § 325C.01, subd. 5 (1982):

"Trade secret" means *information,* including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives *independent economic value,* actual or potential, *from not being generally known to, and not being readily ascertainable by proper means by, other persons* who can obtain economic value from its disclosure or use, *and*

(ii) is the subject of *efforts that are reasonable under the circumstances to maintain its secrecy.*

(Emphasis added). Applying the statutory test, we hold that, like the plaintiff in *Jostens,* ECC has not met its burden of proving the existence of any trade secrets. Therefore, we must reverse the district court's order even though the district court in this case found trade secrets to exist and made specific findings leading up to that ultimate conclusion. Because we do not lightly reverse the district court, we feel compelled to discuss all three elements of trade secret status under the Act as they relate to the evidence and the findings of the district court.

■■■ (a) *Not generally known, readily ascertainable.* The trial court found the information regarding the ECC 1125–03–003 to be secret. This finding was not clearly erroneous. First, the trial court found on conflicting evidence that CMI could not *readily* (i.e. quickly) reverse engineer a motor with exactly the same dimensions, tolerances, and materials as the ECC

1125–03–003. This finding was not clearly erroneous. Reverse engineering time is certainly a factor in determining whether information is readily ascertainable. *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 94, 273 N.E.2d 393, 396 (1971); *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 359–60, 224 N.W.2d 80, 92–93 (1974). The complexity and detail of dimensional data also bears on its ascertainability. *A.H. Emergy Co. v. Marcan Products Corp.,* 389 F.2d 11, 16 (2d Cir.1968) ("[I]t is well settled that detailed manufacturing drawings and tolerance data are prima facie trade secrets."); *Henry Hope X-Ray Products, Inc. v. Marron Carrel,* 674 F.2d 1336, 1340–41 (9th Cir.1982) (configuration of gear system and tolerances was secret).

■■■ Second, the district court found that the exact combination of features of the 1125–03–003 is unique, even though none of the processes or features are unique in the industry and the 1125–03–003 is not the only way to achieve the required performance. Novelty is not a requirement for trade secrets to the same extent as for patentability. *E.g., Clark v. Bunker,* 453 F.2d 1006, 1009 (9th Cir.1972). On the other hand, some novelty is required; mere variations on widely used processes cannot be trade secrets. Thus, in *Jostens,* a type of computer system was held not to be secret where it merely combined known subsystems (and where defendant had produced a different system).[10] In the present case the exact combination of features of the 1125–03–003 could be characterized as a unique solution to the needs of one customer in the industry.

■■■ The district court's findings as to ascertainability and uniqueness are supported by the record. ECC introduced testimony that ECC's particular combination of production techniques is unique and that

---

**10.** *Compare Jostens* and *Pressure Science, Inc. v. Kramer,* 413 F.Supp. 618 (D.Conn.), *aff'd,* 551 F.2d 301 (2d Cir.1976) (manufacturing processes for metal seals not trade secrets where others in industry used same processes and could easily reproduce seals), *with Forest Laboratories, Inc. v. Pillsbury Co.,* 452 F.2d 621 (7th Cir.1971) (process of "tempering" effer-

vescent tablets, by leaving in a dry room for 24 to 48 hours before packaging, was a trade secret) and *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.,* 401 F.Supp. 1102 (E.D.Mich.1975) (combination of known elements in computer software system was a trade secret where unique, and defendant copied almost exactly).

only general design principles circulate in the industry. Further, expert testimony conflicted on how "readily" ascertainable are the features of the motor by reverse engineering, (although the evidence does contradict the trial court's finding that the adhesives are not ascertainable). Therefore, the finding of the trial court, that the features of the motor are not generally known or readily ascertainable, is supported by substantial evidence and is not clearly erroneous.[11]

■ This is not to suggest that ECC could make out a claim for trade secret status for the entire class of ECC moving coil motors, or even for the ECC 1125 in general. If a new customer devised an application for the ECC 1125 and CMI modified its 440 motor to meet those new specifications, ECC could not object. In that case ECC would be trying to protect, not a specific combination of features, but the design process of trial and error, (including the talent of ECC's employees), by which those features are adapted to a given use. The law of trade secrets will not protect talent or expertise, only secret information. *See, Dynamics Research Corp. v. Analytic Sciences Corp.,* 9 Mass.App. 254, 274–75, 400 N.E.2d 1274, 1286 (1980) (engineering management system really involved talent of consultants, not information, so not a trade secret), and cases cited therein.

(b) *Independent economic value from secrecy.* This statutory element carries forward the common law requirement of competitive advantage. The trial court found ECC to have a competitive advantage in the ECC 1125–03–003, not over all competitors, but over "any company which has not, through its own efforts or through license, obtained similar information." CMI claims that ECC was required to show a competitive advantage over all competitors, including those competitors already successfully producing motors.

■ The statute requires that a trade secret "[derive] independent economic value ... from not being generally known ... and not being readily ascertainable ...." Minn.Stat. § 325C.01, subd. 5(i). This does not mean, as CMI contends, that the owner of the trade secret must be the only one in the market. Several developers of the same information, for example, may have trade secret rights in that information. Uniform Trade Secrets Act § 1, Commissioner's Comment, 14 U.L.A. 542–43 (1979). If an outsider would obtain a valuable share of the market by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable.

■ It is true that, as CMI contends, the trial court's stated reasons for its finding of a competitive advantage are not valid as to the 1125–03–003. First, the court cited a "dearth of effective competitors for its principal customer" as evidence of advantage. The trial court could only have meant *brushless* motors customer IBM, since Honeywell is an approved source for the 1125 motor sold to Storage Technology.

---

11. The ECC 1125 represents the "state of the art" in low inertia DC motors. Its dimensions, tolerances, and adhesives are easier to determine and its manufacturing processes are more familiar to engineers today than in the mid-1970's when the 1125 was developed. We recognize that, by allowing possible trade secret protection for the features of the 1125, we risk stifling the ability of employees to leave their employment and compete with their former employers (in the absence of a valid non-competition agreement) using "state of the art" knowledge.

Nevertheless, we believe that such a result is necessary under the Act. The trier of fact, especially in very technical cases such as the present case, should be given the discretion to decide the difficult issue of whether information is generally known or readily ascertainable. The danger to legitimate competition, mentioned above, will be mitigated by the following factors: (1) plaintiffs' burden of proof respecting this finding and the other elements of trade secret status; (2) plaintiffs' inability, once employees have left plaintiffs' employ, to protect information with respect to which plaintiffs did not make "reasonable efforts to maintain secrecy" during defendants' employment; and (3) the courts' duty to fashion a remedy which will balance employers' rights to protect secrets with employees' rights to compete using "state of the art" knowledge. *E.W. Bliss Co. v. Struthers-Dunn, Inc.,* 408 F.2d 1108, 1112–1113 (8th Cir.1969).

Second, the court cited the time and money ECC reasonably expended in developing its motors. That ECC expended time and money between 1966 and 1975 in the development of the 1125 motor and its predecessors does not support a finding of competitive advantage unless, under the present state of the art, a prospective competitor could not produce a comparable motor without a similar expenditure of time and money.[12] The trial court found, however, that such time and money *would* be required of a prospective competitor today, and that finding was supported by some evidence. The ECC 1125, therefore, did provide ECC with economic value from its secrecy, as the statute requires—value that ECC would lose if any prospective competitor could enter the market (cutting into ECC's market share) without a substantial development expense.

 (c) *Reasonable efforts to maintain secrecy.* It is this element upon which ECC's claim founders. The district court found that, even though ECC had no "meaningful security provisions," ECC showed an *intention* to keep its data and processes secret. This finding does not bear upon the statutory requirement that ECC use "efforts that are reasonable under the circumstances to maintain ... secrecy." Minn.Stat. § 325C.01, subd. 5(ii). The "intention" language used by the district court comes from the common law test for trade secret status. *Cherne Industrial, Inc. v. Grounds & Associates, supra,* 278 N.W.2d at 90. However, even under the common law, more than an "intention" was required—the plaintiff was required to show that it had manifested that intention by making some effort to keep the information secret. *Id.* at 91; *Jostens, supra,* 318 N.W.2d at 700.

 This element of trade secret law does not require maintenance of absolute secrecy; only partial or qualified secrecy has been required under the common law. *Radium Remedies Co. v. Weiss,* 173 Minn.

342, 347–48, 217 N.W. 339, 341 (1928). What is actually required is conduct which will allow a court acting in equity to enforce plaintiff's rights. In speaking of the requirement, one commentator has stated:

It would appear, from the standpoint of a broad overview, that the policy goal of the doctrine is to preclude employee liability unless the employer can establish that his treatment of the knowledge in issue has been adequate to indicate a breach of the confidential relationship. It might also be said that the goal is to preclude vindictive employers from placing employees in mental-bondage.

Sloan, *Trade Secrets: Real Toads in a Conceptual Garden,* 1 W.St.U.L.Rev. 113, 145 (1973). To put it another way, the employer must come into court with clean hands; the employer cannot complain of the employee's use of information if the employer has never treated the information as secret.

It is this aspect of trade secret law which truly sets it apart from the other two means through which employers can protect information—patents, and employment contracts containing a non-competition clause. The latter two remedies depend on only a single act by the employer. Trade secret protection, on the other hand, depends upon a continuing course of conduct by the employer, a course of conduct which creates a confidential relationship. This relationship, in turn, creates a reciprocal duty in the employee to treat the information as confidential insofar as the employer has so treated it (see discussion of misappropriation, section B., *infra*).

 In the present case, even viewing the evidence most favorably to the findings below, we hold that ECC did not meet its burden of proving that it used reasonable efforts to maintain secrecy as to the ECC 1125–03–003. We acknowledge that ECC took minimal precautions in screening its Handbook and publications for confidential information and by requiring some of its

---

**12.** Therefore, the third common law element of trade secret status, that the information must have been developed at plaintiff's expense, is not completely eliminated by the Act, as we suggested in *Jostens,* 318 N.W.2d at 698 n. 4. Under the Act it becomes a possible element of proof that the information provides a competitive advantage.

employees to sign a confidentiality agreement,[13] but these were not enough.

First, ECC's physical security measures did not demonstrate any effort to maintain secrecy. By "security" we mean the protection of information from discovery by outsiders. Security was lax in this case. For example, the main plant had a few guarded entrances, but seven unlocked entrances existed without signs warning of limited access. Employees were at one time required to wear badges, but that system was abandoned by the time of the events giving rise to this case. The same was generally true of the Amery, Wisconsin plant where ECC 1125 and brushless motors were manufactured. One sign was posted at each plant, however, marking the research and development lab at Hopkins and the machine shop at Amery as restricted to "authorized personnel." Discarded drawings and plans for motors were simply thrown away, not destroyed. Documents such as motor drawings were not kept in a central or locked location, although some design notebooks were kept locked.

The relaxed security by itself, however, does not preclude a finding of reasonable efforts by ECC to maintain secrecy. Other evidence did not indicate that industrial espionage is a major problem in the servo motor industry. Therefore, "security" measures may not have been needed,[14] and the trial court could have found trade secrets if ECC had taken other reasonable measures to preserve secrecy.

However, ECC's "confidentiality" procedures were also fatally lax, and the district court was clearly in error in finding ECC's efforts to be reasonable. By "confidentiality" in this case we mean the procedures by which the employer signals to its employees and to others that certain information is secret and should not be disclosed.[15] Confidentiality was important in this case, for testimony demonstrated that employees in the servo motor business frequently leave their employers in order to produce similar or identical devices for new employers. ECC has hired many employees from other corporations manufacturing similar products.[16] If ECC wanted to prevent its employees from doing the same thing, it had an obligation to inform its employees that certain information was secret.[17]

ECC's efforts were especially inadequate because of the nonintuitive nature of ECC's claimed secrets here. The dimensions, etc., of ECC's motors are not trade secrets in as obvious a way as a "secret formula" might be. ECC should have let its employees

---

**13.** Thus, this case is not as extreme as was *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628 (Minn.1982), in which plaintiff itself publicly disclosed the supposedly confidential information.

**14.** Compare *E.I. duPont deNemours & Co., Inc. v. Christopher,* 431 F.2d 1012 (5th Cir.1970), cert. denied 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971) (not reasonably necessary to guard against aerial reconnaissance flight, which showed plaintiff's plant design during construction of plant), *with Capsonic Group, Inc. v. Plas-Met Corp.,* 46 Ill.App.3d 436, 5 Ill.Dec. 41, 361 N.E.2d 41 (1977) (secrecy not reasonably maintained where plant had no guard, no passes were required, drawings were not kept locked, and people on tours were not told that any information was confidential).

**15.** Of course, physical security measures are one way of signalling to employees that certain information is secret. However, as discussed in the preceeding paragraphs, ECC's security was too lax to serve as such a signal.

**16.** One ECC employee actually prided himself on the information he had brought with him from his former employer. One day, just before that employee left ECC to join another company, the president of ECC found him copying documents after hours. ECC never questioned the employee or warned him or his new employer that certain information was confidential.

**17.** *See Future Plastics, Inc. v. Ware Shoals Plastics, Inc.,* 340 F.Supp. 1376 (D.S.C.1972) (where plaintiff company's engineer had left plaintiff and formed new competing company and plaintiff had never objected, plaintiff had not treated processes as confidential and could not enjoin defendant employee, who joined other competitor); *Sun Dial Corp. v. Rideout,* 29 N.J.Super. 361, 102 A.2d 90, *aff'd.* 16 N.J. 252, 108 A.2d 442 (1954) (even though plaintiff conducted limited plant tours and published vague articles about secret process, reasonable confidentiality was maintained where other efforts were taken to protect secret information).

know in no uncertain terms that those features were secret.

Instead, ECC treated its information as if it were not secret. None of its technical documents were marked "Confidential", and drawings, dimensions and parts were sent to customers and vendors without special marking. Employee access to documents was not restricted. ECC never issued a policy statement outlining what it considered to be secret. Many informal tours were given to vendors and customers without warnings as to confidential information. Further, two plants each had an "open house" at which the public was invited to observe manufacturing processes.

The district court relied on certain contrary evidence to show ECC's "intention," but this evidence does not demonstrate reasonable efforts to maintain confidentiality. There was no showing that a 1977 memo from the president of ECC to its managerial employees, warning them to restrict unannounced laboratory tours in the interests of protecting secrets, had ever been enforced. The confidentiality agreements signed by the employees were too vague to apprise the employees of specific "secrets." (*See* note 1, *supra*).

The exit interviews also did not constitute reasonable efforts to maintain secrecy. The exit interviews, a procedure initiated by ECC only after it became clear that the employees were about to work for Mahoney, occurred a mere ten days before the commencement of this litigation. These "interviews" were little more than attempts to intimidate or threaten employees, to prevent them from leaving ECC and engaging in legitimate competition using their skill and expertise. Such thinly-veiled threats certainly do not qualify as ongoing efforts to maintain the secrecy of specific information. The law of trade secrets does not condone, and this court certainly will not reward, ECC's conduct.

In summary, ECC has not met its burden of proof in establishing the existence of any trade secrets. The evidence does not show that ECC was ever consistent in treating the information here as secret.

B. *Misappropriation.*

 Since no trade secrets existed to be misappropriated, we technically need not reach the issue of whether misappropriation occurred. However, as we noted above the concept of trade secret status and the concept of misappropriation should not be artificially separated. In the present case the concepts are so interrelated that we feel compelled to discuss the tort of misappropriation. Misappropriation involves the acquisition, disclosure, or use of a trade secret through improper means. Minn.Stat. § 325C.01, subd. 3. "Improper means" are defined as

> [T]heft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means.

Minn.Stat. § 325C.01, subd. 2. In the employer-employee context of the present case, ECC was required to show some duty on the part of the employee not to disclose the information. ECC claims that the employees' duty here arose from the employee agreements and from a confidential employer-employee relationship.

However, a common law duty of confidentiality arises out of the employer-employee relationship only as to information which the employer has treated as secret:

> [T]he employee is entitled to fair notice of the confidential nature of the relationship and what material is to be kept confidential.

*Jostens, supra,* 318 N.W.2d at 702 (citing Ellis, *Trade Secrets* 79 (1953)). Therefore, in the present case, ECC's failure to make reasonable efforts to maintain secrecy, discussed above, was fatal to its claim of a confidential relationship. The employees were never put on notice of any duty of confidentiality. The employee agreements do not help ECC's claim for the same reason—ECC never treated specific information as secret. Therefore, the agreements' vague language prohibiting the employee from taking "secrets" did not create a duty of confidentiality in the employee, and no misappropriation occurred.

We reverse the district court's final order of October 19, 1981 (Appeal No. C0–81–1188).

#### C. *Contempt Order.*

Since we find no misappropriation, we reverse the district court's final order and need not decide whether the final relief granted by the district court was proper. In a separate order, however, the district court held CMI in civil contempt, and that order must be reviewed.

 On April 16, 1981, the district court enjoined CMI from selling any D.C. servo motor "for which any component not available on the open market has dimensions closer than 10% to Plaintiff's 1125 motor." CMI then sent the armature of a CMI 440 motor to Magnedyne Corp. for an estimate of Magnedyne's price to produce the armature. Magnedyne quoted a price for the armature. (The normal procedure for obtaining the quotation, however, would have been to send drawings and dimensions of the armature to Magnedyne). Because of the quotation from Magnedyne, CMI contends that all parts of the CMI 440 are "available on the open market" and that CMI did not violate the injunction by selling the 440.

The district court stated that CMI's interpretation would render the injunction meaningless. We agree, for under CMI's interpretation any part of any motor would be "available on the open market," if CMI could find someone who would copy the part, and therefore no motors could ever be the subject of the injunction. CMI's interpretation was unreasonable and was in fact a shallow pretext used to justify a clear violation of the injunction.

We agree with CMI that the injunction was extremely broad and that compliance would have made continued operations difficult for CMI, and we doubt that the injunction was necessary to protect ECC from irreparable harm. CMI could have sought modification or review of the injunction. Its decision to violate the injunction instead of seeking its modification demonstrated disrespect for an order of a court of this state, and the district court properly held CMI in contempt.

 The district court originally awarded ECC contempt damages of $50 per CMI motor and also ordered CMI to pay the premiums on ECC's cost bond. Later the per-unit damages were rescinded for lack of supporting evidence, but CMI remained liable for the premiums. We believe that the bond premium liability is an appropriate remedy because CMI's actions rendered the bond meaningless. Therefore, we affirm the district court's contempt order (Appeal No. C7–81–894), in all respects.

Appeal No. C7–81–894 is affirmed; appeal No. C0–81–1182 is reversed.