**BELLBOY SEAFOOD CORPORATION, Appellant,**

v.

**Fred L. NATHANSON and F. Nathanson & Company, Respondents.**

No. C2-87-10.

Court of Appeals of Minnesota.

Aug. 11, 1987.

Craig Gagnon, Mark Wine, Oppenheimer, Wolff & Donnelly, Minneapolis, for appellant.

Anne McKinsey, Rita McConnell, Robins, Zelle, Larson & Kaplan, Minneapolis, for respondents.

Heard, considered and decided by PARKER, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

PARKER, Judge.

This appeal is from the entry of partial summary judgment against appellant Bellboy Seafood Corporation on two counts of its action against respondents Fred Nathanson and Nathanson & Company (Nathanson). The court ordered judgment dismissing Bellboy's claims of misappropriation of trade secrets and breach of contract, after finding no just reason for delay. Minn.R.Civ.App.P. 104.01. Nathanson has filed a notice of review of the judgment entered for Bellboy following a jury verdict finding Nathanson breached his fiduciary duty. We affirm and remand for trial on damages.

## FACTS

Bellboy Seafood Corporation is a subsidiary of Bellboy Corporation, which is involved in the meat-trading business. Both corporations were formed by Martin Bell, who decided to add the seafood business in 1975 and contacted Fred Nathanson for that purpose.

Nathanson, a boyhood friend of Bell's, was living in Louisville, Kentucky, at the time, working in the seafood industry.

Bell and Nathanson met in Louisville on January 10, 1976, to discuss the proposed seafood venture. Although no written contract was introduced, there was evidence they agreed on the following details of an employment agreement: Nathanson would receive a salary of $28,000 and a share of the profits, or "override," starting at 9 percent and increasing to 45 percent after five years; he would pay his share of the profits in the last fiscal year if he left and went into the seafood business in competition with Bellboy. They also agreed Nathanson would not enter the meat-trading business. Bell claims the entire agreement was written down and retained by Nathanson.

The seafood trading venture grew, reaching sales of $4 million in 1982. In December of that year, Nathanson discussed his dissatisfaction with Bell. He told Bell he wanted equity ownership in Bellboy Seafood and 50 percent of the profits. He told Bell he had cousins interested in setting him up in business.

Some of Bellboy's customers became aware of Nathanson's dissatisfaction with Bell. One of these was Sea West, a large supplier from which Bellboy was beginning to earn sizable brokerage fees. Nathanson admitted mentioning his "problem" to Sea West personnel.

By the weekend of March 12–13, 1983, Nathanson had decided to leave Bellboy. The following week he was scheduled to go to Louisville to testify in a criminal case against an employee of a major Bellboy customer, New Orleans House restaurants. Bell asked Nathanson to speak to the restaurants' owner about limiting their credit. Nathanson did not discuss this problem with the owner, but did talk to him about his leaving Bellboy and going into business for himself. He also talked to another Louisville customer, as well as his own brother, who was also a Bellboy customer.

Nathanson testified that he did not solicit the New Orleans House owner or other Bellboy customers, or ask them to stop buying from Bellboy. His characterization of the conversations, however, was impeached by his deposition testimony that "[t]he implication was there" that they should buy from him in the future. Nathanson admitted talking to three other customers or suppliers about his departure, for a total of six contacts.

On March 17 Nathanson told Bell he had decided to leave. He said he was giving three or four weeks' notice and mentioned the possibility of buying up Bellboy's inventory. Bell called members of his family that night to photocopy company records in Nathanson's office—principally, the customer control cards.

On March 18 Bell and Nathanson disagreed on what work Nathanson would do for his remaining term, and they agreed to an immediate separation. Nathanson began putting customer control cards in his briefcase, as he testified, "[t]o aggravate [Bell]." Bell warned him not to take them or any proprietary information. Nathanson testified that he dropped the cards back in the desk and left.

Nathanson also picked up personal items from his desk and, inadvertently, he testified, gathered with them some Bellboy documents, including a Sea West pricing list, an accounts receivable "aging" report showing current Bellboy customers, and some orders. These, and some Bellboy materials Nathanson had at home, were mailed to Bellboy the following week.

Bellboy claims Nathanson copied or removed other documents—principally, Rolodex cards and customer control cards. Testimony, however, conflicted on whether Nathanson ever had or used a Rolodex. Bell testified he had ordered more than 2,200 customer control cards printed, but found only about 500 in Nathanson's desk.

Phyllis (Rodenberg) Meath, a Bellboy employee who joined Nathanson's company, testified that she helped Nathanson compile a customer list, from memory and from telephone calls, the week after his resignation. She testified that she and Nathanson used no Bellboy documents. This corroborated Nathanson's account. Meath testified that Nathanson had never used a Rolodex, although she did. She testified that she had made about 60 long-distance calls to develop customer information. Phone records showed 41 calls to about 20 different numbers.

Bellboy introduced their Specialty Foods customer control card and a card for the same supplier used in Nathanson's business. Both cards had an obsolete phone number crossed out. Bellboy argued that if Nathanson had developed his customer list from memory and from phone calls, as he claimed, he could not have reproduced the obsolete phone number.

Nathanson worked out of his home the first week. He made a few sales, the first to the New Orleans House restaurants. After developing a customer list, he mailed out an announcement thanking the addressees for their past business with him at Bellboy.

Bellboy sold a few orders to New Orleans House after March 18, but had lost the account to Nathanson within four weeks. This represented 25–33 percent of its business. Sea West canceled the brokerage agreement with Bellboy on March 22 and went with Nathanson. This relationship had generated $70,000 in brokerage commissions the previous fiscal year. Bell immediately hired a replacement for Nathanson, but sales fell "precipitously."

The trial court granted partial summary judgment to Nathanson on the claims of breach of contract and misappropriation of trade secrets. The court concluded the liquidated damages clause (if it in fact existed) was an unenforceable penalty provision. The court determined that Bellboy's customer information was not a "trade secret," because Bellboy had not made reasonable efforts to maintain its secrecy. The court allowed to go to the jury the claim of breach of fiduciary duty by misuse of confidential information and by solicitation of Bellboy customers. The jury found a breach of fiduciary duty on both counts. There was no trial of the damages issue, as the parties had agreed to bifurcate the trial and because Bellboy sought to appeal the dismissal of the liquidated damages claim.

## ISSUES

1. Did the trial court err in granting summary judgment on Bellboy's claim for liquidated damages?

2. Did the trial court err in granting summary judgment on the claim of misappropriation of trade secrets?

3. Was there sufficient evidence of a breach of fiduciary duty to withstand Nathanson's motions for directed verdict and JNOV?

## ANALYSIS

### I

In order to determine whether a contractual provision is one for liquidated damages, rather than an unenforceable penalty clause, the court must determine (1) if the fixed amount is a reasonable forecast of just compensation for the harm caused by the breach; and (2) if the harm is incapable or very difficult of accurate estimation. *Gorco Construction Co. v. Stein*, 256 Minn. 476, 482, 99 N.W.2d 69, 74–75 (1959).

The trial court concluded that although Bellboy's damages were difficult to estimate in 1976, the "override" did not bear a reasonable relation to those damages. The court also concluded the provision was unenforceable because it required a forfeiture of earned income. *See Harris v. Bolin*, 310 Minn. 391, 395, 247 N.W.2d 600, 603 (1976) (clause which allowed company president to declare entire profit-sharing account of employee forfeited if he left to compete was unenforceable).

The trial court did not address the enforceability of the liquidated damages provision as a covenant not to compete. Nathanson argues the provision is unenforceable because it imposes unlimited restraint on his ability to enter into competing employment. *See Bennett v. Storz Broadcasting*, 270 Minn. 525, 134 N.W.2d 892 (1965) (covenant is judged by the nature of the employee's job, the time he is restricted from competing, and the territorial extent of the restriction). Bellboy contends the clause did not prevent Nathanson from competing, but only required him to compensate Bellboy for doing so.

This was an oral covenant and, by all accounts, unlimited. Bell, by affidavit, stated he would not have tried to enforce the liquidated damages clause had Nathanson waited six months to open shop. How-ever, such a limitation was not expressed in the agreement.

If, as Bellboy contends, the "liquidated damages" provision was not a covenant not to compete, then we conclude it was a penalty, as the trial court found. A liquidated damages provision is intended to apply to a breach of contract. Bellboy fails to explain what contractual provision Nathanson would have breached other than a covenant not to compete, since there was no definite term of employment.

If, however, the provision was a covenant not to compete, it was unlimited as to time, harm to Bellboy, or geographical area. Therefore, it is unenforceable. *See Harris v. Bolin*, 247 N.W.2d at 603.

### II

The trial court granted summary judgment dismissing the claim of misappropriation of trade secrets, concluding that Bellboy had not taken the reasonable efforts to maintain secrecy required by *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 901 (Minn.1983), *pet. for rev. denied*, (Minn. Sept. 12, 1984).

The Uniform Trade Secrets Act provides that, in order to be "trade secrets," information must be

the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn.Stat. § 325C.01, subd. 5(ii) (1986).

The supreme court in *Electro-Craft* stated:

However, a common law duty of confidentiality arises out of the employer-employee relationship only as to information which the employer has treated as secret * * *.

*Electro-Craft*, 332 N.W.2d at 903. Thus, the court appears to have equated the confidentiality required for fiduciary duty with the "reasonable efforts to maintain secrecy" required for a misappropriation claim. The trial court here let the claim of breach of fiduciary duty by use of confidential information go to the jury, which found for Bellboy. We are not sure the trial court's comparison of Bellboy's confidentiality pro-

cedures with those in *Electro-Craft* was appropriate, since that case involved the very different circumstances of a large manufacturer, employing over 500 people, trying to protect manufacturing specifications. *Id.* at 902–03. However, we see no prejudice to Bellboy, which prevailed on its common law theory. The damages issues have not been tried, and we leave for further proceedings the question of what damages Bellboy may claim for the breach of fiduciary duty.

### III

The trial court submitted to the jury the claims that Nathanson breached his fiduciary duty by using Bellboy's confidential information and by soliciting its customers before his departure. The court denied Nathanson's motion for a directed verdict on these claims, as well as his motion for judgment notwithstanding the verdict.

As indicated above, we believe there was sufficient evidence of Bellboy's efforts to maintain confidentiality to present to the jury the claim of a breach of fiduciary duty by the use of confidential information. In light of the size and nature of its business, Bellboy's customer information did not require extensive confidentiality measures. Only Nathanson and his secretary had access to the customer cards. The confidentiality of the information was apparent to Nathanson, as he testified at trial.

There was considerable conflict in the evidence on Nathanson's alleged use of Bellboy information. Bellboy claimed Nathanson had taken his Rolodex(es) with him, as well as many of the customer control cards. Although Martin Bell testified that Nathanson used a Rolodex, other witnesses testified that he did not. Moreover, the Rolodex file apparently included only the customer name, address and phone number, with a buyer's name, information that may have been readily obtainable. *See Cherne Industries, Inc. v. Grounds & Associates*, 278 N.W.2d 81, 90 (Minn.1979) (protected matter must not be readily ascertainable).

The jury could have found the Specialty Foods customer card could not have been "reconstructed" as claimed by Nathanson because of the anomaly of the obsolete phone number. Bellboy also presented evidence that other documents were retained over the weekend. The jury could have found Nathanson used these documents, regardless of whether they were inadvertently retained.

It was undisputed that Nathanson talked to Bellboy customers and suppliers about his plans before leaving Bellboy. He denied soliciting business. However, this was a matter of nuance and inference which was for the jury to determine. Nathanson conceded "[t]he implication was there" that those he talked to should switch their business to his new enterprise. This would have been a breach of fiduciary duty. *See Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 112 N.W.2d 42 (1961) (employee may prepare to enter a competing business, but may not solicit his employer's customers before leaving the job).

■ We conclude the evidence was sufficient to support the jury's verdict that Nathanson breached his fiduciary duty both by soliciting Bellboy customers and by using its confidential information.

### DECISION

The trial court did not err in granting respondent summary judgment on the liquidated damages claim or the claim of misappropriation of trade secrets. The jury's verdict of breach of fiduciary duty was sufficiently supported by the evidence.

Affirmed and remanded for trial on damages.