**NORTHWEST AIRLINES, Plaintiff,**

v.

**AMERICAN AIRLINES, Defendant.**

**Civ. No. 4–91–539.**

United States District Court,
D. Minnesota,
Fourth Division.

April 12, 1994.
As Redacted May 23, 1994.

See also 792 F.Supp. 655.

Thomas Tinkham, Dorsey & Whitney, Minneapolis, MN, for plaintiff.

James Quinn, Weil, Gotshal & Manges, New York City and Janie Mayeron, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, for defendant.

MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, Chief Judge.

Plaintiff Northwest Airlines, Inc., (Northwest) brought this declaratory judgment action against defendant American Airlines, Inc., (American) seeking a determination of the legal issues surrounding Northwest's hiring of certain American employees. American counterclaimed alleging Northwest had tortiously interfered with American's employment contracts and misappropriated trade secrets related to finance and yield management information.[1] Before the court is plaintiff's motion for summary judgment.[2]

## I.

Between November 1990 and approximately April 1992, Northwest hired 17 former employees in American's finance and yield management departments. All were terminable at will employees, and none had signed non-compete agreements with American. Some of the employees contacted Northwest, some were recruited to Northwest by other former American employees, and others were recruited through a headhunter.

Yield management refers to a system of analyzing financial, logistical, and market data, to make forecasts that become the basis for important business decisions for airlines. Yield management utilizes computer systems and complex equations incorporating many variables to run simulations that help forecast flight information. American claims to have spent 30,000 hours annually, and invested tens of millions of dollars over the last decade, developing the most sophisticated yield management technology in the industry. It claims its yield management system, called DINAMO (Dynamic Inventory And Maintenance Optimizer), gives it a substantial competitive advantage over its competitors and is responsible for increased revenues of $100 million per year.

(redacted)

In 1989 and 1990, Northwest began to reevaluate its yield management system and decided to make an investment in improving it. At first it decided to build a completely new, next generation system that would leap frog the competition at a cost of around $30 million. Northwest hired a consultant, IDeaS Inc., to assist on the project. Due to concerns about cost and the risks involved, the project was dropped. Northwest then negotiated about purchasing a fully developed system from American. These discussions broke down, however, when American sought Northwest's Chicago–Narita (Tokyo) route authority as compensation. Northwest claims it then decided to make improvements to its existing system.

To accomplish this task, Northwest hired experienced people from both within and outside the airline industry. Between January 1990 and July 1992 it hired 136 employees for its finance and yield management departments. Of the experienced hires, seventeen

---

1. American later amended its counterclaims to add a claim for copyright infringement. Northwest does not seek summary judgment on that claim at this time.

2. Both parties filed motions for leave to file supplemental memoranda; the motions are granted, and the court has considered the supplemental material. In addition, American filed a motion to strike the affidavit of Marc Diamond on the grounds that he lacked personal knowledge of the material it contained. Diamond was a member of the Northwest team working on yield management issues, and was thus aware of the activities of the team through meetings, joint efforts and memoranda. American's concerns go more to the weight that should be attributed to Diamond's affidavit, and the motion to strike is denied. Nevertheless, the statements in the affidavit need to be considered in light of where Diamond's knowledge is personal.

came from American, 21 from other airlines, and 45 from other types of companies.

While American contends the hires were for the purpose of obtaining confidential proprietary information, Northwest states all were hired for their individual abilities and that it took precautions to prevent any former American employee from bringing confidential information to Northwest. Some of the precautions Northwest claims it took included: written instructions in some offer letters not to bring any American materials; verbal instructions; having its in-house counsel interview all the former American employees and collect anything they might have brought along so it would not be used; and written statements expressing Northwest's policy not to use anything from American.

Northwest admits that despite these precautions, former American employees did bring documents and other materials with them. Among the most significant of these were several yield management documents brought with her by Laura Liu and a computer disk containing spill tables acquired through Ben Baldanza.[3] American argues that before obtaining these documents and spill tables, Northwest's yield management system contained none of the five key features of the American DINAMO system. Just six months after getting them, the Northwest system contained all five features says American.

## II.

Northwest argues it is entitled to summary judgment on American's misappropriation counterclaim.[4] Such a claim requires proof of: 1) the existence of a trade secret; and 2) the unauthorized use or acquisition of that trade secret. Minn.Stat. § 325C.01 (1992).

A trade secret is defined in Minn.Stat. 325C.01 subd. 5 as information that:

i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a trade secret if, under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret be maintained.

### A.

Northwest argues there are no trade secrets involved here because any information obtained from American was generally known, readily ascertainable, and available in the public domain. It contends that exponential smoothing equations and other features were available in textbooks and industry literature.

American responds that summary judgment should be denied on its misappropriation claim because the materials appropriated by Northwest are trade secrets and Northwest acquired them through improper means. American argues that its yield management information has tremendous economic value and is responsible for yearly revenue increases of $100 million. It contends that while some mundane types of information are shared between airlines, no

---

**3.** Spill analysis involves determining the number of passengers who cannot be accommodated on a particular flight (i.e. "spilled") because of either seat capacity limitations or yield management controls on the availability of particular fare classes.

**4.** American's counterclaim for unfair competition does not appear to state an independent claim. Under Minnesota law, unfair competition is not a unique tort with specific elements, but

rather a "general category of torts" recognized for the protection of commercial interests. *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305 (Minn.Ct.App.1987) (citing W. Prosser and W. Keeton, The Law of Torts § 130 at 1015 (5th ed. 1984)). American's unfair competition count does not appear to state any claim not already contained in its tortious interference and misappropriation of trade secrets claims, and should therefore be dismissed as duplicative of the other counts.

technical data such as equations and American- specific spill tables are shared.

■ American argues Northwest's actions belie its assertion that the information is generally known. American argues Northwest spent millions of dollars and several years unsuccessfully trying to develop its own system. Northwest then tried to purchase American's system. When analyzing American documents brought over by former employees and comparing the current Northwest system to the American system, Northwest employees were instructed to replace all references to American with "A1". American argues these actions are inconsistent with the assertion that American's information is generally known and readily ascertainable. Finally, even if parts of the technology could be found elsewhere, Northwest did not find it elsewhere, and therefore cannot hide behind the argument that it could have found the information in articles it was not aware of at the time.

When viewed in the light most favorable to the nonmoving party, as required on summary judgment, American has produced enough evidence to create a genuine issue of material fact concerning whether the information brought to Northwest was generally known or readily ascertainable. For example, a jury could infer that the American-specific tables were not generally known or readily ascertainable from evidence that Ben Baldanza, after he began work at Northwest, asked Lisa O'Connell to send them to him shortly before she left American. In addition, a jury could conclude that the information in the Laura Liu documents was not readily ascertainable based on a Northwest memo analyzing the documents which stated:

> Undoubtedly, such insights, and other aspects of the [American] approach have resulted from many years of experience and gained insight, and time constraints on this project would make an independent investigation very difficult.

"Demand Forecasting, Summary of Existing Techniques", at 8 (Affidavit of Barry Craig Smith Exhibit 6).

Summary judgment is inappropriate on the present record. Northwest cites articles in the public domain which it argues contain the principles of the American system, but there are issues of material fact as to whether it was aware of these sources at the time it was changing its yield management system, whether it actually acquired the yield management and other information from these public sources rather than the American documents, and whether or not American's yield management techniques existed in the public domain at a level of specificity which would enable formulation of working applications of the various principles solely from public sources. Such issues are best decided by the trier of fact. *Electro–Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 900 n. 11 (Minn.1983) ("The trier of fact, especially in very technical cases ... should be given the discretion to decide the difficult issue of whether information is generally known or readily ascertainable.")

### B.

Northwest next argues that there are no trade secrets in this case because American failed to make reasonable efforts to keep the information confidential. It argues reasonable efforts require a continuing course of conduct to keep such materials secret. Northwest argues that the general non-disclosure clauses in American employment applications and other company regulations were not enough because there were no procedures to inform and review the provisions with the employees, and no policy statements defining exactly what is considered confidential information. While American did take precautions with respect to some of its information by stamping it confidential, requiring disclosure statements, and restricting access to it, none of the documents Northwest received were subject to such procedures it says. American knew how to set up proper security for information it deemed confidential, but chose not to take such steps with this material.

American argues that it has taken reasonable precautions to ensure the secrecy of its information. It requires employees to sign an employment application that warns against disclosure of trade secrets; it requires employee orientation and gives each

employee a handbook containing specific provisions on maintaining confidentiality; it writes an annual conflict of interest letter to remind management level employees of their responsibilities in keeping information confidential; it restricts access to computer system through access codes; it maintains a reference library for the Pricing and Yield Management Department that requires signing a nondisclosure statement to sign out certain materials; and it excludes specific details from seminars and speeches given outside of American. American argues this is enough to create a fact issue over whether its precautions were reasonable under the circumstances to put its highly educated and technically trained employees on notice that the information taken to Northwest was confidential.

■ Mere intention to keep material confidential is not enough to confer trade secret protection. *Electro–Craft Corp. v. Controlled Motion. Inc*, 332 N.W.2d 890, 902 (Minn.1983). Both the common law and the statute require showing that the intention was manifested by reasonable efforts to maintain secrecy. *Id.* (citing *Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691, 700 (Minn.1982)). Reasonable efforts to maintain secrecy requires a continuing course of conduct "by which the employer signals to its employees and to others that certain information is confidential and should not be disclosed." *Electro–Craft Corp. v. Controlled Motion. Inc*, 332 N.W.2d 890, 902 (Minn.1983). Absolute secrecy is not required, but the confidentiality measures must be "reasonable under the circumstances". Minn.Stat. § 325C.01 subd 5(ii). Confidentiality measures are sufficient "if, under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained." *Id.*

The leading Minnesota case on this issue is *Electro–Craft Corp. v. Controlled Motion. Inc*, 332 N.W.2d 890 (Minn.1983). In *Electro–Craft*, the plaintiff claimed its manufacturing processes and technical specifications were trade secrets. *Id.* at 898. The Minne-

sota Supreme Court found no trade secrets existed because plaintiff had not taken reasonable steps to maintain secrecy of the information. *Id.* at 901. Plaintiff did not maintain physical security of the premises, did not label technical documents "confidential", and did not issue a policy statement on what it considered confidential. *Id.* at 902–03. The court noted that measures to identify confidential information are especially important in industries where employees frequently leave to work for competitors. *Id.* at 902. Also, employers must inform employees "in no uncertain terms" that secrets of a "nonintuitive nature" are not to be disclosed. *Id.* at 903.

Northwest argues that this case is on all squares with *Electro–Craft*. It argues that employees often move around within the airline industry, that American failed to mark confidential the particular documents and spill data eventually brought to Northwest, and it did not have a specific policy to inform employees of what was confidential.

■ There are some similarities between this case and *Electro–Craft*, but when the record is viewed in the light most favorable to the nonmoving party, as it must be on summary judgment, a fact question exists as to whether American's confidentiality measures were reasonable under the circumstances. Several factors lead to this conclusion. As expressly stated in 325C.01 subd. 5(ii), the fact that the documents and spill data brought to Northwest were not expressly labeled confidential is not dispositive on the issue of reasonable efforts to maintain secrecy.

The existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a trade secret if, *under all the circumstances*, the employee or other person knows *or has reason to know* that the owner intends or expects the secrecy of the *type of information* comprising the trade secret be maintained.

Minn.Stat. § 325C.01 (emphasis added).[5] Other documents within the Yield Management Department were labeled confidential, and the documents were kept within the department. The yield management documents appear to have been distributed on a need to know basis, and not given to customers or other persons outside of American. *See, Surgidev Corp. v. Eye Technology, Inc.,* 648 F.Supp. 661, 694 (D.Minn.1986). American required employees to sign disclosure statements to check out some, but not all, materials related to pricing and yield management. It sent out annual confidentiality reminders to management and required employees to sign a general nondisclosure statement. There is evidence to suggest that these procedures were effective in putting employees on notice of what was confidential. For example, John R. Samuel of American's Yield Management Department states that all the employees in the department know that the documents of the type Laura Liu took to Northwest are confidential. Samuel Affidavit ¶ 11.

American took a variety of other precautions beyond what was done in the Yield Management Department. It required employees to sign an employment application which included a nondisclosure statement. It published company regulations on the need to keep information confidential and limiting the level of detail allowed in public presentations outside of American. It used a computer password system to prevent unauthorized access to information.

While the non-disclosure statements and the regulations are stated in broad terms, they must be considered within the context of all the confidentiality measures and the nature of the employees within the Yield Management Department. The American analysts and managers in yield management are for the most part well-educated and experienced in the airline industry. They are aware of the importance of yield management to the profitability of an airline, and the tremendous resources that are invested in developing, implementing, and improving yield management systems, and the DINAMO system in particular.

Given the level of sophistication and technical expertise of the employees that went to Northwest, the court cannot say that as a matter of law the measures taken by American did not give the employees reason to know that American intended or expected the secrecy of those types of information be maintained. *See,* Minn.Stat. § 325C.01 subd. 5(ii). As the Minnesota Supreme Court noted in *Electro–Craft,* employees need more guidance to appreciate the confidentiality of secrets of a non-intuitive nature. The trade secrets alleged here involve highly technical mathematical equations and algorithms. It is unclear on this record how the sophistication of the American material compared to what may have been in the public domain. There is a fact question over whether or not the material would be recognized as confidential by employees with the level of education and technical expertise that the former American employees had. While American certainly could have taken more steps to signal the confidentiality of the materials taken to Northwest, the court is unable to say as a matter of law that the confidentiality measures were unreasonable under the circumstances to confer trade secret status.

## C.

Northwest contends there was no misappropriation even if material was properly protected.[6] It argues the only alleged im-

---

**5.** This paragraph was added to Minn.Stat. § 325C.01 in 1985, two years after the decision in *Electro–Craft.*

**6.** Misappropriation is defined as:
(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or
(B) at the time of the disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was
(I) derived from or through a person who had utilized improper means to acquire it;
(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

proper means of appropriation was through a breach of the duty of confidentiality, and there is no evidence that Northwest intentionally induced or participated in such a breach. Northwest also claims it has never used any of the alleged trade secrets. It says all changes to Northwest's systems resulted from the use of industry public domain techniques and methodologies, or Northwest's own development efforts and independent thought wholly unrelated to any information obtained from American.

American contends that it has evidence of Northwest's misappropriation and use of the information as well. First, it submits the affidavit of an American employee, James F. Barlow, stating that during an interview at Northwest, he saw American spill tables on the desk of the person with whom he was meeting. American also points to the affidavit of its expert, Barry Craig Smith, who analyzed Northwest's computer programs and concluded they contain proprietary information belonging to American.

■ American claims Northwest acquired the information through the improper means of inducing a breach of the duty of confidentiality between American and its employees. American argues the duty of confidentiality covers all information the American employees knew or should have known was confidential. It argues that everyone in the Pricing and Yield Management Department knew the documents Liu brought to Northwest were confidential, and that Northwest utilized the information knowing that it was confidential.

Genuine issues of material fact prevent summary judgment on this ground. A trier of fact could conclude from the Laura Liu documents Northwest possessed and the affidavits of Barlow and Smith, that Northwest had acquired and/or utilized the American material. It could also infer from evidence of Northwest's unsuccessful attempts to purchase the technology from American, and Baldanza's request to Lisa O'Connell for spill tables, that it hired the American employees with the intention of obtaining confidential yield management material.

### III.

■ To prove tortious interference, American must prove: 1) the existence of a contract; 2) Northwest's knowledge of the contract (or relationship); 3) Northwest's intentional procurement of its breach; 4) without justification; and 5) damages resulting from the interference. Northwest argues that American cannot prove intent, lack of justification, or damages.

Northwest argues that American cannot show an intent to induce any breach because Northwest actually took serious precautions to prevent proprietary information from being brought to Northwest by the former American employees. It also contends that merely offering employment to an at will employee is protected by the competitor's privilege[7] and is not enough to establish a claim for tortious interference.

Defendant responds that its tortious interference counterclaim does not relate to the at will employment relation, but to the employees' contractual and common law duties of confidentiality. Each American employee signed an employment agreement with a non-disclosure clause. Employees also have a common law duty not to "wrongfully use confidential information or trade secrets ob-

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of the discloser's or user's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. Minn.Stat. § 325C.01 subd. 3.

7. Under the competitor's privilege doctrine:

1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:

a) the relation concerns a matter involved in the competition between the actor and the other; and

b) the actor does not employ wrongful means; and

c) the action does not create or continue an unlawful restraint of trade; and

d) the purpose is at least in part to advance his interest in competing with the other. *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn.1982).

tained from an employer." *Jostens, Inc. v. National Computer Systems,* 318 N.W.2d 691, 701 (Minn.1982). Defendant argues Northwest tortiously interfered with these contractual and common law duties by inducing employees to leave American with the intent of misappropriating trade secrets.

There is at least an issue of fact over whether Northwest knew of the employees' contractual duties because it requires its new employees to sign similar agreements, and many of the former American employees had been active in American's hiring process. The court has already found a genuine issue of fact as to Northwest's intent in hiring the employees. *See,* Section IIC, *supra.* As for justification, American argues the competitor's privilege does not apply because Northwest used wrongful means. Evidence such as Baldanza's request to Lisa O'Connell to send him American spill tables, after O'Connell had accepted a position at Northwest but before she left American, creates an issue of fact over whether Northwest improperly induced a breach of the confidentiality duties of American employees. Summary judgment on the tortious interference claim is inappropriate in light of these fact issues.

### ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1) the motions for leave to file supplemental memoranda are granted;

2) defendant's motion to strike the affidavit of Marc Diamond is denied;

3) plaintiff's motion for summary judgment is granted as to defendant's separate counterclaim for unfair competition, and that count is dismissed; and

4) plaintiff's motion is denied with respect to all other counts in defendant's amended counterclaim.