**LASERMASTER CORPORATION,**
**Plaintiff,**

v.

**SENTINEL IMAGING, a division of**
**Sentinel Business Systems, Inc.,**
**Defendant.**

**Civil No. 3–95–981.**

United States District Court,
D. Minnesota,
Third Division.

Feb. 22, 1996.

**630**

Kenneth A. Liebman, Randall E. Kahnke, and Julianne Knox of Faegre & Benson, P.L.L.P., Minneapolis, MN, for plaintiff, Lasermaster Corporation.

Michael H. Streater and Michael J. Kane of Briggs and Morgan, St. Paul, MN, for defendant, Sentinel Imaging.

## MEMORANDUM AND ORDER

DAVIS, District Judge.

This matter came before the Honorable Michael J. Davis on January 12, 1996 upon plaintiff, Lasermaster Corporation's ("plaintiff") motion for preliminary injunction. For the reasons set forth below, plaintiff's motion is *denied* in its entirety.

### *FACTUAL BACKGROUND*

Before the Court is plaintiff's motion to enjoin defendant, Sentinel Imaging ("Sentinel") from engaging in what plaintiff claims are violations of the Lanham Act and misappropriation of plaintiff's trade secrets. Plaintiff is a company based in Eden Prairie, Minnesota engaged in the development, manufacture and sale of wide-format ink jet printers, the computer hardware and software involved in running the printers, and the ink and printing media, i.e., paper or vinyl, used in the printing process. Defen-

dant is involved in the sale of paper, film and ink into large format ink jet printers.

In late 1993, plaintiff introduced the DisplayMaker Professional Printer ("DM Pro") which prints photo-realistic images by any length and up to 36 inches wide. The DM Pro was designed for use by art professionals and other entities requiring high-quality print. Plaintiff markets the DM Pro along with a group of other LaserMaster products, including a computer, a docking station and, at the customer's option, the LaserMaster ColorMark color management system.

In late 1994, defendant instituted a project to develop a large volume ink system that would be compatible with the DM Pro. According to defendant, it embarked upon this project after repeated requests by its customers to devise and market a lower priced ink system for use with the customers' printers. In the spring of 1995, defendant completed its project and began marketing its own large volume ink system known as the "Color Key Ink Delivery System." [1] It is the development and subsequent attempted sale of this system which spurred the present controversy.

### Development of the Profiler-type Computer Chip

In approximately March, 1995, Brian Haberstroh, a former employee of LaserMaster, was contacted by the owner of a DisplayMaker printer to determine whether Haberstroh could duplicate the Profiler computer chip ("Profiler"). The Profiler is the computer chip sold with plaintiff's large volume ink delivery system and used in the "docking station" attached to the printer and electronically attached to the software that runs the printer. Haberstroh expressed interest in the idea and thereafter contacted Brian Falk, an electrical engineer who had worked at LaserMaster as a hardware engineer until November, 1993. According to defendant, Falk removed the case of the computer chip and stated that it would be "simple" to replicate the chip using the process of reverse engineering. On or about May 15, 1995, Haberstroh accepted a position with Sentinel

and thereafter contracted with Falk to proceed with the project to reverse engineer the Profiler. Although they experienced a few minor problems, Haberstroh and Falk were ultimately able to replicate the Profile and, according to Haberstroh, print a perfect print on the DisplayMaker printer using the prototype Sentinel chip.

It is during the process of devising the Profiler prototype that plaintiff alleges Haberstroh used trade secret information which Haberstroh learned at LaserMaster. Specifically, plaintiff alleges that Haberstroh had access to plaintiff's highly-proprietary computer program known as "dongle.exe" used to configure the Profiler. Haberstroh claims that he never received a copy of the program, but plaintiff's alleges that his E-mail demonstrates that he had access to a copy of "dongle.exe" prior to departing from LaserMaster. Plaintiff further alleges that Haberstroh asked Falk during the reverse engineering of the Profiler if it would help to have a copy of the "dongle.exe" program; Falk, however, refused.

Defendant counters, however, that no LaserMaster trade secret or confidential information was used to complete the Profiler prototype. Defendant claims that Falk had no difficulty ascertaining the software code and did not have access to a DisplayMaker printer.

### Development and Advertising of Sentinel's Inks

To duplicate an ink delivery system like BIDS, defendant contacted Formulabs, Inc., a specialty ink manufacturer located in California. John Urlaub, a product development chemist at Formulab, led the project and worked with Haberstroh to match the LaserMaster inks. After a process of trial and error over the course of a few months, defendant alleges that Urlaub developed an ink which, in Haberstroh's opinion, was a "perfect visual match" with the LaserMaster inks. In the last week of September 1995, defendant finally launched its advertising campaign to promote its CKIDS product. It

---

**1.** Plaintiff's ink delivery system is known as the Big Ink Delivery System ("BIDS") which provide

four different colored inks: cyan, yellow, magenta and black.

is the particular advertisement from this campaign which plaintiff contends is violative of the Lanham Act.[2]

### The Customer Lists and the Media Trade Secrets

In addition to the Lanham Act violations, plaintiff contends that it is entitled to relief because defendant received the benefit of a number of plaintiff's trade secrets. Specifically, plaintiff argues that another of its former employees, Bruce Compton, divulged to defendant a number of customers from plaintiff's confidential customer list who owned LaserMaster DM Pros and the key contacts at those customers. Plaintiff argues that Compton identified these names despite his prior signature on a nondisclosure agreement with plaintiff and despite his understanding that customer information was not to be disclosed. Defendant admits that Compton identified 25 to 30 customers he became familiar with during his employment at LaserMaster as well as 10 to 20 additional customers whose names he recognized. Nevertheless, defendant argues that disclosure of this information does not violate any trade secret laws.

Additionally, plaintiff argues that Haberstroh misappropriated at least two media trade secrets: (1) the existence of Teslin, a paper/plastic sheeting product manufactured by PPG Industries, Inc.; and (2) information relating to Rexham Graphics, plaintiff's media supplier. Defendant counters, however, that neither disclosure was improper because the information regarding both Teslin is heavily advertised for use with ink jet printers and defendant knew of Rexham Graphics long before Haberstroh's arrival.

As set forth in detail below, the Court denies plaintiff's motion for preliminary injunction in its entirety.

### DISCUSSION

The Eighth Circuit has established the following analysis to be used in considering a preliminary injunction motion:

[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *accord Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1090 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). Whether a motion for preliminary injunction should be granted rests with the sound discretion of the Court. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 667 (8th Cir.1987). In weighing these factors, no single factor is dispositive; rather, all of the factors must be considered in determining whether on balance they tip toward granting injunctive relief. *Id.*

### Likelihood of Success on the Merits

1. Lanham Act Violations

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use of false or misleading statements in commercial advertising. Establishing a violation of § 43(a) requires proof of the following factors: (1) defendant made false statements of fact about its own products, or plaintiff's products in its advertisement; (2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) the deception is material because it is likely to influence buying decisions; (4) defendant caused its falsely advertised goods to enter interstate commerce; and (5) plaintiff has been or is likely to be injured as a result of these activities either through direct diversion or sales from plaintiff to defendant, or by injuring the goodwill its products enjoy with the buying public. *Alternative Pioneering Systems, Inc. v. Direct Innovative Products, Inc.,* 822 F.Supp. 1437, 1441–42 (D.Minn.1993). In order to prove that defendant made false statements

**2.** Plaintiff alleges, however, that defendant began promotion of its inks before Formulabs could complete its testing because defendant was anxious to begin marketing its new product. As a result of the incomplete testing, plaintiff alleges that defendant's customers were dissatisfied with the product, prompting Formulabs to modify the product.

of fact about its product or plaintiff's product, plaintiff must demonstrate that the statements made in the ad are either literally false or the representations, although true, are likely to mislead consumers. *Id.* at 1442.

■ Plaintiff alleges that defendant's ad violates section 43(a) of the Lanham Act in two respects. First, plaintiff contends that the following phrase in the ad is either literally false or misleading:

> There's only one way to tell the difference between LaserMaster's Big Ink Delivery System and our new Color Key Ink Delivery System. Ours costs 50% less ... The Color Key Ink delivery system won't make any difference in how you use your Displaymaker—only in what you pay.

Second, plaintiff argues that defendant's claim regarding "perfect color matching" is also false: "Extensive testing has proven our ink provides perfect color matching with greater depth ... Sentinel Tru Color DMC inks have been specifically formulated to match LaserMasters [sic] ColorMark inks."

Both plaintiff and defendant rely in part upon the deposition of John Urlaub regarding the "perfect color matching" statement in the ad:

> Q (by attorney): Referring to that statement, you indicated that the Sentinel magenta was very similar to the LaserMaster magenta; is that right?
>
> A (by Urlaub): Um, on page 2, I referred to that in the first paragraph, yes.
>
> Q: Okay. And by "very similar," you said that—you defined that as being a situation where a normal person couldn't perceive a difference. Do you recall that?
>
> A: Yes, that's very likely true.
>
> . . . . .
>
> Q: Okay. What about the Sentinel cyan, have you compared the Sentinel cyan to the LaserMaster cyan?
>
> A: Yes, I have.
>
> Q: And how would you characterize that comparison?
>
> A: I would say that they are very similar.
>
> Q: Again, using very similar as you've defined it, meaning a normal person could not perceive a difference between the two?

> A: Unless they looked very closely. I believe that anyone can see differences as long as they know what to look for, but just by glancing at the page and looking at two right next to each other, I doubt that you could really see the difference on a printed page, although—although in a liquid form, there are noticeable differences.
>
> Q: What about the Sentinel yellow in printed form versus the LaserMaster yellow in its printed form, have you compared those two?
>
> A: Yes, I have.
>
> Q: And how would you describe that comparison?
>
> A: The ink which Sentinel Imaging currently is purchasing, I would say that a normal person could perceive the differences between the two.
>
> Q: How would you describe the differences?
>
> A: I believe that the ink which we produce for Sentinel Imaging has a deeper, richer color than the LaserMaster ink, which I feel looks more pale and washed out.

Deposition of John Urlaub, pp. 205–206.

Plaintiff argues that this testimony provides sufficient evidence to demonstrate the falsity of defendant's ad regarding the "perfect color match." Specifically, plaintiff points to Urlaub's testimony regarding the yellow ink in which he stated that Formulab continues to experiment with defendant's yellow ink in order "to more closely emulate the color on a printed page of the LaserMaster's inks" because defendant "prefers to have an exact match." Deposition of John Urlaub, p. 207.

But this testimony does not, in and of itself, render defendant's ad literally false. The ad explicitly states that the inks are a "perfect color match *with greater depth.*" Thus, Urlaub's statement that defendant's yellow has a "richer, deeper color" than plaintiff's is perfectly consistent with the statement in its ad.

Nor is the Court persuaded by plaintiff's argument that Formulab was continuing to modify the Sentinel ink formula in order to

provide a more exact match to the Laser-Master product. In the Court's view, the ad does not convey the notion that the ink of the two companies are chemically identical or precisely the same in every respect; it merely states that examination of the two inks reveals a perfect identify of color with defendant's product possessing "greater depth." As Urlaub stated in his deposition, a normal person could not perceive a difference between the ink's colors.

More importantly, plaintiff does not refute the testimony of Haberstroh who oversaw the development effort by Urlaub and instructed him to make modifications in the inks until they exhibited a "perfect visual match." As Haberstroh stated in his deposition,

Q (by attorney): And what were the results of those test prints?

A (by Haberstroh): My opinion, they were beautiful. They were perfect.

Q: O.K. When they—they were "perfect" when you—and when you say "perfect"

you mean—what do you mean by that?

A: That they were a perfect visual match, in my—in my eyes from the LaserMaster ink to the Formulabs ink or such Sentinel ink.

Deposition of Brian Haberstroh, p. 335. Haberstroh further testified that the "perfect color matching" claim was based upon a test in which a viewer, standing 10 feet from the images, examines them. If the two appear identical to the viewer, then a perfect color match exists. This testimony, along with Urlaub's deposition testimony provide sufficient evidence to refute plaintiff's allegations regarding the literal falsity or misrepresentative nature of defendant's "perfect color match" advertisement.

■ Plaintiff also makes allegations regarding the falsity or misleading character of the extensive tests conducted by defendant. To prove an advertising claim literally false, plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive. *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991) (citing *Procter & Gamble Co. v.*

*Chesebrough–Pond's Inc.*, 747 F.2d 114, 119 (2d Cir.1984)). Rather, plaintiff must provide affirmative evidence showing that such tests are "not sufficiently reliable to permit one to conclude with reasonable certainty that they established" the claim made. *Id.*

Without any supporting affidavits, exhibits, or contravening tests, plaintiff simply argues that the printing and analysis undertaken by Haberstroh with 80 ink formulations were faulty. Plaintiff never argues that the tests conducted by Haberstroh did not reveal the results set forth in defendant's ad nor does plaintiff adequately explain why Haberstroh's visual comparison *combined with* the printing and analysis of 80 ink formulations was not a legitimate means of testing its products.

### 2. Trademark Infringement

■ 15 U.S.C. § 1114 prohibits a party from using without consent a registered mark in connection with the sale or advertising of any goods or services where such use is likely to cause confusion or mistake. The essential question is whether purchasers are likely to be confused as to the source of the different products. *Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d 190, 192 (8th Cir.1982) (citing *SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1090–91 (8th Cir.1980)). Generally, a likelihood of confusion has been established if an appreciable number of reasonable buyers are confused by the similar marks. *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419, 1427–28 (D.Minn. 1989) (citing 2 McCarthy, *Trademarks and Unfair Competition 2d* § 23.1(B) (1984); *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir.1979)).

■ In evaluating the issue of likelihood of confusion, the Eighth Circuit has set forth a series of factors: (1) the strength of the infringed trademark; (2) whether the trademarks examined as a whole are similar; (3) the degree to which the products compete with one another; (4) intent on the part of the alleged infringer to pass off its goods as the product of another; (5) evidence of actual confusion; and (6) whether the kind of product, its costs and conditions of purchase, allow the purchaser to eliminate the likeli-

hood of confusion which would otherwise exist. *Id.* (citing *SquirtCo.*, 628 F.2d at 1091). The Court will analyze each of these factors in turn.

 Plaintiff argues that defendant conveys the false impression that its products are associated by using the name "Color Key", making the allegedly false claims about matching LaserMaster's inks and using plaintiff's products and trademarks in its ad without acknowledgment. In support of this argument, plaintiff sets forth a cursory, one-paragraph analysis arguing that actual confusion has been established, the trademark is both inherently distinctive and has acquired secondary meaning, and defendant intended to pass off its goods as if they were associated with LaserMaster.[3] Plaintiff cites two instances in which customers appeared to be confused about the existence of any relationship between plaintiff and defendant; this evidence, however, is insufficient to grant a preliminary injunction regarding trademark infringement.

Moreover, the Eighth Circuit has explicitly stated that an imitator may use a competitor's trademark in a truthful way when advertising the imitator's product as long as the use is not likely to create confusion in the consumer's mind as to the source of the product being sold. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir.1987). An inspection of the ad[4] reveals a concerted effort by Sentinel to distinguish rather than affiliate the two products. The ad is replete with references to "our" system, i.e., Sentinel's versus the LaserMaster system. The ad contains a large bold distinction stating "There's only one way to tell the difference between LaserMaster's Big Ink Delivery System and our new Color Key Ink Delivery System. Ours costs 50% less." The ad contains repeated references to the CKIDS and its advantages over plaintiff's BIDS. Additionally, the ad clearly displays defendant's unique logo at the top and bottom of the page, indicating that the advertisement is defendant's. Nowhere within the four corners of the ad is there any allusion to an affiliation with plaintiff. Plaintiff's product is mentioned solely for distinction not association.

### 3. Misappropriation of Trade Secrets

 Analysis of whether an item is a trade secret under Minnesota law requires consideration of the following factors: (1) the information must not be generally known or readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the party asserting misappropriation must have made reasonable efforts to maintain secrecy of the item. *Nordale, Inc. v. Samsco, Inc.*, 830 F.Supp. 1263 (D.Minn.1993) (citing Minn.Stat.Ann. § 325C.01, subd. 5). Although absolute secrecy is not required, the confidential measures must be "reasonable under the circumstances." *Northwest Airlines v. American Airlines*, 853 F.Supp. 1110, 1115 (D.Minn. 1994) (citing *Electro–Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 902 (Minn.1983)). If, under all the circumstances, the employee knows or has reason to know that the owner intends or expects the information to be secret, confidentiality measures are sufficient. *Id.*

Plaintiff also seeks to enjoin defendant from misappropriating plaintiff's trade secrets relating to: (1) the development and existence of Teslin media and LaserMaster's media vendor; (2) customer information; and (3) the Profiler computer chip. The Court will address each of these claims in turn.

### a. The Teslin Media and Rexham Graphics

 Plaintiff alleges that Haberstroh divulged confidential information regarding LaserMaster's use of Teslin as a media due

---

**3.** Plaintiff's recitation to *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419 (D.Minn.1989) is also misplaced given the fact that plaintiff has failed to point out exactly what the similarities are between its trademark and that of defendant's. An examination of the advertisement does not reveal a similarity warranting an inference of intent under *Aveda*.

**4.** In proceeding upon a motion for preliminary injunction, visual inspections by the Court are permissible in evaluating likelihood of confusion. *Calvin Klein Cosmetics Corp.*, 815 F.2d at 503.

to his role in developing new media products for LaserMaster. Additionally, Haberstroh worked closely with Rexham Graphics and was exposed to confidential information which plaintiff claims Haberstroh knew was confidential.

An examination of the advertisement by PPG Industries, Inc., the manufacturer of Teslin, however, reveals that Teslin is specifically promoted for use with ink jet printing: "Teslin also is as versatile a sheet as exists today, boasting compatibility with offset, letter press, gravure, flexography, laser, screen, *ink jet,* and thermal transfer printing processes." (Ludvigsen Affidavit, Exhibit B) (emphasis added). Given this explicit reference to ink-jet compatibility, the Court does not find that divulging information regarding Teslin is plaintiff's trade secret. The fact remains that LaserMaster, Sentinel—and every potential reader of this advertisement—is privy to Teslin's use with ink jet printers.

Defendant has also proffered compelling evidence demonstrating that Rexham is a well known supplier of media to the ink jet industry, a fact which plaintiff admits. Additionally, defendant provides the testimony of John Ludvigsen, Vice President of Sentinel, who was involved with Rexham for the potential sale of media products. Mr. Ludvigsen also claims that he knew that Rexham supplied media products to LaserMaster long before Haberstroh's arrival. Injunctive relief for this claim is therefore unwarranted.

### b. Profile Computer Chip

■ Plaintiff also alleges that Haberstroh took the detailed information that he learned about the Profiler software and used that information to break the Profiler code when defendant encountered problems during reverse engineering. The evidence, however, does not support plaintiff's position. Both Haberstroh and Falk testified during their depositions that no LaserMaster trade secrets were used to reverse engineer[5] the Profiler. Additionally, defendant cites the testimony of David Lilja, an electrical engineer at the University of Minnesota, who stated that confidential information would not be needed to reverse engineer the Profiler. Although plaintiff points out that Mr. Lilja had no opinion about the configuration of the Profiler chip's contents and its significance, that alone is not dispositive.

The Court accepts plaintiff's allegation that the information about the configuration of the Profiler chip's contents and its significance are some of the things Haberstroh learned while at LaserMaster. But that does not necessarily mean that, when defendant turned to Haberstroh to solve its reverse engineering problems, Haberstroh necessarily utilized that allegedly confidential information to solve their problems. As plaintiff points out, it was Falk who expressly stated that he did not want a copy of the "dongle.exe" to program the chip. Plaintiff further states that "Seven and one-half hours later, Falk and Haberstroh, working together, had broken the Profiler software code that Falk, working alone, had not been able to solve since he started working on the software in July or early August." Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction, p. 8.

Plaintiff has not alleged that the only way for Haberstroh to complete the reverse engineering process was to utilize plaintiff's confidential information. Nor has plaintiff proffered significant circumstantial evidence demonstrating that Haberstroh's information regarding the contents of the Profiler chip was crucial to solving defendant's reverse engineering problems. *See e.g. SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1260 (3d Cir.1985) (inference of misappropriation of trade secrets was permissible where there was ample evidence that appellants used secret formula which was crucial in designing identical system). They merely allege that defendant is liable because Haberstroh was primarily responsible for solving defendant's problems in an expeditious manner. This cannot give rise to an inference of trade secret violation. As the Ninth Circuit stated in *SI Handling Systems,* "[T]he concept of a trade secret does not include "[a] man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective

---

**5.** Reverse engineering is a permissible method of discovering knowledge. *Bonito Boats, Inc. v.* *Thunder Craft Boats, Inc.,* 489 U.S. 141, 155, 109 S.Ct. 971, 980, 103 L.Ed.2d 118 (1989).

knowledge as he obtains while in the course of his employment ... the right to use and expand these powers remains his property ..." " *Id.* at 1255 (quoting *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 38 A.2d 33, 34 (1994)).

### c. The Customer List

██ Plaintiff also seeks relief from defendant for Compton's identification of Laser-Master customers and the key contacts at those customers. Defendant admits that Compton identified 35 to 45 customers that he had become familiar with during his employment at LaserMaster. But defendant argues that Compton was not a party to a non-compete agreement and identifying customers in a region which Compton sold was not in and of itself improper because such information is public knowledge. Defendant further alleges that it purchased a list identifying 1200 service bureaus throughout the United States which offer printing services to the customer. Defendant then contacted each service bureau to determine whether they owned an ink jet printer, and if so, what brand. Utilizing this process, defendant contends that it amassed a list of over 4000 ink jet printer locations throughout the United States. Therefore, because the information disclosed by Compton was readily accessible, defendant concludes that no trade secret existed.

In assessing whether information is protected under trade secret laws, the Court must observe the competing interests at stake. At one end lie the purposes behind the trade secrets law, i.e., maintaining standards of commercial ethics and encouraging research and innovation. *Fleming Sales Co. v. Bailey,* 611 F.Supp. 507, 511 (N.D.Ill.1985). At the other end are equally compelling interests regarding policies encouraging competition through the liberal exchange of ideas and information. In this case, the Court finds that the factor which weighs against plaintiff's motion is the accessibility of the information sought to be protected.

Particularly instructive of the accessibility of the information at issue is the *Fleming* case. In *Fleming,* the Court held that information as to customers, including knowledge of contact persons, prior purchasing history, and product and service requirements do not constitute trade secrets under the Uniform Trade Secrets Act. *Id.* at 512. The Court reasoned that such information is "readily ascertainable by proper means over the course of time without efforts beyond those ordinarily exerted by salesmen in developing countries." *Id.* at 514. The Court further stated that such information "comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses." *Id.* In the present action, the information sought to be protected fits squarely within the *Fleming* jurisprudence.

Plaintiff's argues that the facts of the present action are much like those in *Surgidev Corp. v. Eye Technology, Inc.,* 648 F.Supp. 661 (D.Minn.1986), *aff'd,* 828 F.2d 452 (8th Cir.1987) where the Court held that a former employee's identity of opthamologists who were high volume implanters or who were to become high volume implanters or who implanted investigational lenses were protectible as trade secrets. Fundamental to the Court's holding in *Surgidev,* however, was the fact that plaintiff proffered numerous testimony demonstrating that the identify of high volume implanters is considered to be confidential in the opthamalogical industry. *Id.* at 682. In the present action, plaintiff proffers no persuasive evidence whatsoever to bolster its proposition that the information of this type is highly proprietary or confidential.[6]

---

**6.** Plaintiff's recitation to the Laumeyer Declaration and pp. 57–8 and 62 of the Compton deposition do not in any way support the proprietary or confidential nature of the customer lists. Paragraph 26 of the Laumeyer declaration simply set forth a checklist of procedures which plaintiff maintains in order to maintain the confidentiality of its trade secrets. Nowhere within the 2¼ pages does it specifically mention or even allude to the fact that customer lists are highly confidential. Pages 57–8 of the Compton also have nothing to do with customer lists and page 62 merely states the Compton never had physical possession of a full customer list of his region nor did he ever see such a document.

Additionally, the Court stated that while the identity of implanting opthamologists may be general knowledge, the identify of those who implant Surgidev lenses is not generally available given the involved procedure that such physicians have to undertake:

A core implanter is one who agrees to implant investigational lenses and to complete the required investigational documentation ... Opthamologists who implant core lenses must complete and file with the FDA various post-operative reports. In return for fulfilling these record-keeping duties opthamologists are compensated by the manufacturer ... The evidence amply reveals that the identity of doctors who have agreed to do core research for a particular manufacturer is proprietary information not readily accessible to competitors.

*Id.* at 684. In the present action for injunctive relief, plaintiff has failed to show that the type of information in this case is of a confidential or proprietary nature.

### *Balance of Hardships/Public Interest/Irreparable Harm*

The Court finds that analysis of the remaining factors also weighs against granting this motion. Enjoining a competitor from participating in its business imposes a significantly heavier burden than maintaining the status quo. A strong public interest exists in ensuring that two companies such as Laser-Master and Sentinel are allowed to compete in the ink jet market. Finally, the Court does not find that irreparable harm will occur were the Court to deny plaintiff's motion. Although plaintiff alleges that its trade secrets and confidential information will be "devalued", plaintiff fails to demonstrate that the harm it suffers will not be compensable through monetary damages. *Marigold Foods, Inc. v. Redalen,* 809 F.Supp. 714, 720 (D.Minn.1992).

### *ORDER*

Based upon the foregoing analysis and all of the files, records and proceedings, it is HEREBY ORDERED that plaintiff, Laser-

Master Corporation's motion for preliminary injunction is *denied* in its entirety.