*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0186**

Rotary Systems, Inc.,
Appellant,

vs.

TomoTherapy Incorporated,
Respondent,

Dynamic Sealing Technologies, Inc.,
Respondent.

**Filed December 22, 2014
Affirmed in part, reversed in part, and remanded
Peterson, Judge**

Anoka County District Court
File No. 02-CV-11-3560

Eric J. Magnuson, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, Minnesota (for appellant)

Alexandra J. Olson, Carlson Caspers Vandenburgh Lindquist & Schuman, Minneapolis, Minnesota (for respondent TomoTherapy)

John E. Radmer, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota (for respondent Dynamic Sealing Technologies)

        Considered and decided by Reyes, Presiding Judge; Peterson, Judge; and Reilly, Judge.

UNPUBLISHED OPINION

**PETERSON**, Judge

Appellant challenges the summary-judgment dismissal of its trade-secret and related claims, asserting that the district court erred by (1) determining as a matter of law that appellant could not establish the existence of trade secrets because it did not take reasonable measures to protect the alleged secrets, and (2) dismissing its common-law claims as displaced by Minn. Stat. § 325C.07 (2012). We reverse the dismissal of the trade-secret claim and affirm the dismissal of the common-law claims.

## FACTS

*The Parties*

Appellant Rotary Systems, Inc. was founded in 1992 by Jerry Szykulski, its president and chief executive officer. Rotary designs, manufactures, and sells custom rotary unions to businesses throughout the United States.

Respondent Dynamic Sealing Technologies, Inc., which also manufactures rotary unions, was founded in 2002 by former Rotary employee Jeffrey Meister. In March 2002, Meister brought an action against Szykulski and Rotary alleging several claims related to his employment. Rotary filed a counterclaim against Meister and a claim against Dynamic for misappropriation of trade secrets. The 2002 litigation was resolved by settlement.

Respondent TomoTherapy Inc. manufactures radiation-therapy systems that are used to treat cancer patients.

*Development of DO112 Rotary Union by Rotary*

A rotary union is a mechanical device that allows the transfer of fluids and/or gases to and from rotating equipment. The device is used in machinery that requires a constant flow of lubrication, air, or other liquids during rotation. Rotary unions are a common industrial product, but in the case of custom unions, they are designed for a customer's specific application. Rotary designed a custom rotary union, the DO112, for use by TomoTherapy in its radiation-therapy systems. The DO112 provides the capability to deliver radiation continuously from all angles, which allows a tumor to be precisely targeted and minimizes the exposure of healthy tissue to radiation. In 2000, Rotary began designing and developing the rotary union that eventually became the DO112. Information in Rotary's sealed appendix about the design-and-development process and the DO112's components supports Rotary's assertion that the DO112 is a unique product designed for a single customer's specific need.

Rotary's design prints and specifications all contained the following confidentiality provision:

> This drawing is the property of Rotary Systems Inc. and is furnished subject to return on demand. All or part of this document contains information proprietary to Rotary Systems. Recipient agrees not to disclose or reproduce all or part of this drawing or use its contents in any way detrimental to owner's interest.

Szykulski stated in an affidavit that the measures Rotary took to protect confidentiality included not disclosing the DO112's design prints and specifications to a third party unless the party agreed to maintain their confidentiality, requiring employees to sign a

handbook, using a document-shredding company, controlling visitors and limiting access to its facility, keeping the DO112 design prints in storage file cabinets and a segregated records room and restricting access to them on a need-to-know basis, and allowing only approved users access to computers and electronic information. Rotary also required vendors hired to build components for the DO112 to sign confidentiality agreements.

Rotary worked with TomoTherapy engineers to address problems that arose with the DO112. TomoTherapy employees toured Rotary's facility twice during the summer of 2004. Szykulski stated in an affidavit that, in 2005, Mary Dumitrascu, a senior mechanical engineer for TomoTherapy, began requesting specific and detailed information about vendors, manufacturing processes, and design specifications and prints. Szykulski stated that TomoTherapy acknowledged that the design specifications and prints for the DO112 contained information that was proprietary and confidential to Rotary. Szykulski stated that, in reliance on those representations, Rotary provided TomoTherapy with the requested information.

Rotary built and sold its last DO112 to TomoTherapy in June 2007. In October 2007, TomoTherapy told Rotary that it would not be buying any more DO112s. In January 2010, Rotary learned that Dynamic "was engaged in the manufacture and sale of a certain rotary union component . . . that appeared to be identical or substantially similar to the [DO112]."

Rotary brought this action alleging against both respondents a statutory claim of misappropriation of the designs, specifications, and prints for the DO112 in violation of the Minnesota Uniform Trade Secrets Act (MUTSA), Minn. Stat. §§ 325C.01-.07 (2012),

4

and common-law claims of conversion, unjust enrichment, accounting, and conspiracy. Rotary also alleged a claim of unfair competition against only Dynamic and a negligence claim against only TomoTherapy. By order filed August 29, 2011, the district court dismissed with prejudice Rotary's six common-law claims on the ground that they were displaced by the MUTSA.

In August 2013, respondents moved for summary judgment, arguing that Rotary had not taken reasonable measures to protect the secrecy of the DO112 design prints and specifications. When respondents moved for summary judgment, Rotary had a pending motion to compel the deposition testimony of Dynamic's corporate representative and several Dynamic employees. Rotary opposed summary judgment, arguing that Rotary took steps to protect the secrecy of the DO112 design prints and specifications; that summary judgment was premature because the Dynamic employees had not been deposed and the scheduling order permitted discovery to take place until October 2013; and that, if summary judgment was granted for respondents on the MUTSA claim, Rotary should be granted leave to amend its complaint to reassert its common-law claims.

The district court concluded that as a matter of law Rotary failed to take reasonable steps to preserve the DO112's secrecy and granted summary judgment for respondents. The court did not address Rotary's motion to compel discovery, its argument that summary judgment was premature, or its request for leave to reassert its common-law claims. This appeal followed.

5

**D E C I S I O N**

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. We review the district court's grant of summary judgment de novo, to determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 627 (Minn. 2012). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002). "[S]ummary judgment is inappropriate if the nonmoving party has the burden of proof on an issue and presents sufficient evidence to permit reasonable persons to draw different conclusions." *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 507 (Minn. 2006).

**I.**

Minn. Stat. § 325C.01 (2012) states:

> Subd. 3. ""Misappropriation" means:
> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
> (A) used improper means to acquire knowledge of the trade secret; or
> (B) at the time of disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was
> (I) derived from or through a person who had utilized improper means to acquire it;
> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

6

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of the discloser's or user's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

. . . .

Subd. 5. "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a trade secret if, under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained.

The supreme court has explained the reasonable-efforts element of trade-secret law as follows:

This element of trade secret law does not require maintenance of absolute secrecy . . . . What is actually required is conduct which will allow a court acting in equity to enforce plaintiff's rights. In speaking of the requirement, one commentator has stated: "It would appear, from the standpoint of a broad overview, that the policy goal of the doctrine is to preclude employee liability unless the employer can establish that his treatment of the knowledge in issue has been adequate to indicate a breach of the confidential relationship. It might also be said that the goal is to preclude vindictive employers from

placing employees in mental-bondage." Sloan, *Trade Secrets: Real Toads in a Conceptual Garden,* 1 W. St. U. L. Rev. 113, 145 (1973). To put it another way, the employer must come into court with clean hands; the employer cannot complain of the employee's use of information if the employer has never treated the information as secret.

. . . Trade secret protection . . . depends upon a continuing course of conduct by the employer, a course of conduct which creates a confidential relationship. This relationship, in turn, creates a reciprocal duty in the employee to treat the information as confidential insofar as the employer has so treated it . . . .

*Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 901 (Minn. 1983). "The issue of whether a plaintiff took reasonable steps under the circumstances to maintain the secrecy of information is an issue of fact." *Gronholz v. Sears, Roebuck & Co.*, 869 F.2d 390, 393 (8th Cir. 1989) (applying Minnesota law).

In support of its conclusion that as a matter of law Rotary did not make reasonable efforts to maintain secrecy, the district court cited (1) the lack of a nondisclosure or confidentiality agreement between Rotary and Meister, TomoTherapy, or any of TomoTherapy's individual employees; (2) Rotary's failure to provide evidence supporting its claim that its employees were required to sign a handbook; (3) e-mail disclosures to TomoTherapy before and after January 2005; and (4) evidence that (a) TomoTherapy representatives toured Rotary's facility in June and August 2004 and were allowed to gather information regarding the dimensions, materials, and operation of the DO112 without being instructed that what they viewed was a trade secret and that they were prohibited from disclosing what they saw or learned there; (b) Rotary supplied information to one supplier before executing a nondisclosure agreement and to

8

another supplier after the deadline stated in the nondisclosure agreement expired; and (c) "Rotary's drawings and prints contained a boilerplate statement that the drawing contained proprietary information and that the recipient agrees not to disclose the drawing or use its contents in any way detrimental to Rotary's interest." The evidence cited by the district court is relevant to whether Rotary made reasonable efforts to maintain secrecy, but the district court's analysis improperly weighs the evidence instead of viewing it in the light most favorable to Rotary.

As Rotary argues, the lack of formal, written confidentiality agreements is not fatal to its trade-secrets claim. The question is whether, "under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained." Minn. Stat. § 325C.01, subd. 5. Szykulski stated in an affidavit that he had numerous discussions with Meister and another former Rotary employee involved in Dynamic about the confidentiality of Rotary's proprietary information and that they understood the importance of not disclosing design information to competitors. In an affidavit executed in May 2002, Szykulski stated that all other current employees had confidentiality agreements. Rotary is a privately held company with only eight employees as of May 2002. As its president and chief executive officer, Szykulski was qualified to testify that employees had executed confidentiality agreements. *See Niemi v. NHK Spring Co.*, 543 F.3d 294, 300 (6th Cir. 2008) (stating that a "sworn averment of an oral confidentiality agreement" by plaintiff's owner was "probative evidence").

The district court characterized the confidentiality label included on the design prints and specifications as "a boilerplate statement." But the confidentiality label was prominently displayed and expressly stated that the documents contained proprietary information that was not to be disclosed or reproduced in any way detrimental to Rotary's interest. Use of a confidentiality legend is evidence of reasonable efforts. *Aries Info. Sys., Inc. v. Pac. Mgmt. Sys. Corp.*, 366 N.W.2d 366, 368-69 (Minn. App. 1985) (stating that evidence supporting reasonable-efforts finding included company labeling all source-code listings and magnetic tapes containing product with proprietary notices and copyrighted user manuals that stated that all system information was proprietary).

The tours that Rotary provided to TomoTherapy employees in 2004 were provided in connection with Rotary and TomoTherapy's joint effort to address problems with the DO112. Similarly, all of the information provided to TomoTherapy and suppliers or vendors was provided as part of the development process. And the DO112 was a unique product designed and developed for a specific need of a single customer. *See Electro-Craft*, 332 N.W.2d at 902-03 (in reversing finding that company made reasonable efforts to maintain confidentiality, court noted that company gave many informal tours to vendors and customers without warnings about confidential information, "two plants each had an 'open house' at which the public was invited to observe manufacturing processes," and motor dimensions were not obvious trade secrets).

In *Wyeth v. Natural Biologics, Inc.*, the defendant argued that the plaintiff had not taken reasonable efforts to maintain secrecy, alleging that

non-Wyeth employees toured the Brandon Facility without having signed confidentiality agreements; there were no posted signs inside the facility indicating that the Brandon Process information was confidential; unmarked [meaning not identified as trade secrets or confidential] Brandon Process documents were left on the manufacturing floor and unsecured in Wyeth's Brandon Facility; not all Wyeth employees or vendors involved in the Brandon Process signed confidentiality agreements; Wyeth identified chemicals used in the extraction process in two newsletters; unmarked documents were sent to third parties; and Wyeth allegedly failed to follow its own security policies.

395 F.3d 897, 899 (8th Cir. 2005) (footnote omitted). The Eighth Circuit, applying Minnesota law, upheld the district court's finding that the plaintiff took reasonable steps to maintain secrecy. *Id.* at 900 & n.4. The district court's finding was "[b]ased on the lack of repeated losses of confidential information regarding the Brandon Process and Wyeth's use of physical security, limited access to confidential information, employee training, document control, and oral and written understandings of confidentiality." *Id.* at 900.

The *Wyeth* analysis is consistent with the statutory requirement that considering "all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained." Minn. Stat. § 325C.01, subd. 5. Applying the *Wyeth* analysis, we conclude that Rotary presented sufficient evidence to create a genuine issue of fact on whether it made reasonable efforts to maintain confidentiality. We, therefore, reverse the dismissal of Rotary's trade-secret claim and remand for further proceedings.

11

**II.**

Dynamic argues that it is entitled to summary judgment on the alternative ground that this action is barred by the release provision in the settlement agreement in the 2002 lawsuit.

A settlement agreement is a contract, which should be construed as a whole. *Dykes v. Sukup Mfg. Co.,* 781 N.W.2d 578, 581-82 (Minn. 2010); *Chergosky v. Crosstown Bell, Inc.,* 463 N.W.2d 522, 525-26 (Minn. 1990). A court should attempt to harmonize all contract provisions. *Chergosky,* 463 N.W.2d at 525-26. In doing so, the court presumes that the parties intended the language to have effect and interprets a contract to avoid rendering a provision meaningless. *Id.* "Absent ambiguity, the interpretation of a contract is a question of law." *Roernhildt v. Kristall Dev., Inc.,* 798 N.W.2d 371, 373 (Minn. App. 2011), *review denied* (Minn. July 19, 2011).

The settlement agreement contains the following release provision:

> Szykulski and Rotary agree to and hereby do release and discharge Meister and [Dynamic], [Dynamic's] shareholders, directors, officers, employees, agents, subsidiaries, and affiliated companies ("the Meister Parties Released") from any and all claims that they have or may have against the Meister Parties Released or any of them which may have occurred prior to the date of this Agreement. Szykulski and Rotary specifically acknowledge that this release extinguishes all claims against the Meister Parties Released, whether past or present, known or unknown, foreseen or unforeseen, without regard to whether such claims are liquidated or contingent, accrued or unaccrued, or whether based upon contract, equity, tort, statutory violation, or rule of court, from the beginning of time to the date of this agreement.

12

Dynamic argues that the phrase "all claims that they have or may have" should be construed to apply to future claims. Dynamic argues that "[t]he 'may have' language would be unnecessary and surplus if it merely referred to currently-existing claims, because that category of claims is already consumed by the 'that they have' language." We disagree. As a court in another jurisdiction has concluded, such language is intended to apply to conduct, events, and transactions occurring before execution of a release even though the claim might not arise until the future. *Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 317 (4th Cir. 2001). Dynamic is not entitled to summary judgment because this action is barred by the release provision in the 2002 settlement agreement.

**III.**

Statutory interpretation presents a question of law, which we review de novo. *Halvorson v. Cnty. of Anoka*, 780 N.W.2d 385, 389 (Minn. App. 2010).

> [T]he goal of all statutory interpretation is to ascertain and effectuate the intention of the legislature. The first step in statutory interpretation is to determine whether the statute's language, on its face, is ambiguous. In determining whether a statute is ambiguous, we will construe the statute's words and phrases according to their plain and ordinary meaning. A statute is only ambiguous if its language is subject to more than one reasonable interpretation. Multiple parts of a statute may be read together so as to ascertain whether the statute is ambiguous. When we conclude that a statute is unambiguous, our role is to enforce the language of the statute and not explore the spirit or purpose of the law. Alternatively, if we conclude that the language in a statute is ambiguous, then we may consider the factors set forth by the Legislature for interpreting a statute.

*Christianson v. Henke,* 831 N.W.2d 532, 536-37 (Minn. 2013) (quotations and citations omitted).

13

Minn. Stat. § 325C.07 (2012) states:

> (a) Except as provided in paragraph (b), sections 325C.01 to 325C.07 displace conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
>
> (b) Sections 325C.01 to 325C.07 do not affect:
> (1) contractual remedies, whether or not based upon misappropriation of a trade secret;
> (2) other civil remedies that are not based upon misappropriation of a trade secret; or
> (3) criminal remedies, whether or not based upon misappropriation of a trade secret.

Rotary argues that if the district court properly granted summary judgment on its trade-secrets claim, Rotary should be allowed to reassert its common-law claims. Rotary argues that section 325C.07 should be construed as not displacing common-law claims that involve the misappropriation of confidential information that does not meet the definition of trade secret.

In *Superior Edge, Inc. v. Monsanto Co.*, the Minnesota federal district court denied a motion to dismiss a claim under the MUTSA and granted a motion to dismiss a conversion claim when "there [was] no information that [plaintiff] allege[d] was converted that it [did] not also allege is a trade secret." 964 F.Supp.2d 1017, 1039-40 (D. Minn. 2013); *see also SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F.Supp.2d 1175 (D. Minn. 2003) (denying rule-12 motion to dismiss claim under the MUTSA and granting motion to dismiss common-law conversion and tortious-interference claims when common-law claims alleged nothing more than

14

misappropriation of trade secrets). The common-law claims asserted by Rotary are all based on information Rotary claims as a trade secret. As in *Monsanto* and *SL Montevideo*, Rotary identifies no information that is confidential and proprietary that differs from the information claimed to be a trade secret. We, therefore, affirm the dismissal of Rotary's common-law claims.

Because we are remanding the trade-secret claim, we need not address whether the district court prematurely granted summary judgment.

**Affirmed in part, reversed in part, and remanded.**